## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:13-21158-Civ-LENARD/GOODMAN

|  |  |  |
|---|---|---|
| MONICA BARBA and JONATHAN REISMAN, on behalf of themselves and all others similarly situated, | : : : : | |
| Plaintiffs, | : : | **PUBLIC VERSION** |
| v. | : : | |
| SHIRE U.S., INC., a New Jersey Corporation, SHIRE, LLC, a Kentucky Limited Liability Company, and DOES 1 through 100, inclusive, | : : : : | |
| Defendants. | : : | |

## SHIRE'S ANSWER TO FIRST AMENDED
## CLASS ACTION COMPLAINT

Defendants Shire LLC and Shire US Inc. (collectively, "Shire" or "Defendants"), by and through their attorneys, hereby answer the First Amended Class Action Complaint and Jury Demand of Plaintiffs Monica Barba and Jonathan Reisman, individually and on behalf of all others similarly situated (the "Class"), ECF 107-1, and responds to the allegations in the numbered paragraphs thereof as follows:

## I.    NATURE OF ACTION

1.    <u>Complaint</u>:  This is a putative class action comprised of consumer indirect purchasers of Adderall XR ("AXR"), a popular prescription medication prescribed to treat attention deficit hyperactivity disorder ("ADHD"), and generic AXR.

<u>Answer</u>:  The allegations in paragraph 1 set forth legal conclusions for which no response is required.  To the extent that a response is required, Shire admits that

AXR is a prescription medication approved by the U.S. Food and Drug Administration ("FDA") for the treatment of attention deficit hyperactivity disorder ("ADHD").  Shire denies the remaining allegations in paragraph 1.

2.    Complaint:  Defendants, Shire, are the manufacturer of brand-name AXR. Defendants sell AXR under the brand name Adderall XR and also sell it as an "Authorized Generic" to generic companies to sell as a generic product.

Answer:  Shire admits that its sells AXR under the brand name Adderall XR and also sells it to generic companies as an authorized generic.  Shire denies the remaining allegations in paragraph 2.

3.    Complaint:  Though other companies were able to bring an Authorized Generic to the market in 2009, Defendants engaged in a number of illegal schemes meant to delay the entry of generic competition, restrict the supply of generic competition, and maintain the market share of the more expensive branded Adderall XR post-generic entry. Namely, Defendants filed sham patent litigation, constructed anticompetitive reverse payment agreements with generic competitors, then proceeded to breach agreements to supply said competitors with materials to manufacture generic AXR, cutting off supply of cheaper-priced generic AXR to consumers, and ████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████

Answer:  Shire admits that Teva Pharmaceuticals, USA, Inc. and Impax Laboratories, Inc. were able to market a generic version of AXR in the United States in 2009 by reason of Shire's supply of unbranded AXR to those companies pursuant to the Settlements because FDA had not approved their own generic AXR products. Shire denies the remaining allegations in paragraph 3.

4.    Complaint:  Defendants' conduct constitutes an illegal restraint of trade and/or attempt at monopolization in violation of both federal and state antitrust statutes, which harmed consumers by delaying generic entry, and after generic entry, by restricting

2

supply of generic AXR ████████████████, both strategies operating to force many consumers to purchase the far more expensive brand-name medication sold by Defendants.

  Answer:  The allegations in paragraph 4 set forth legal conclusions for which

no response is required.  To the extent a response is required, Shire denies the

allegations in paragraph 4.


  5. Complaint:  Plaintiffs therefore bring this action on behalf of themselves and a Florida Class of indirect purchasers of AXR, asserting that Defendants' anti-competitive behavior (in violation of the Sherman Act, the Florida Antitrust Act, and Florida's consumer protection laws) violates Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et seq.

  Answer:  The allegations in paragraph 5 set forth legal conclusions for which

no response is required.  To the extent a response is required, Shire denies the

allegations in paragraph 5.


## II. PARTIES

  6. Complaint:  Plaintiff Monica Barba is, and at all times relevant hereto was, an individual residing in Miami-Dade County, Florida. During the Class Period, Plaintiff purchased AXR in Miami-Dade County for purposes other than resale.

  Answer:   Upon information and belief, Shire admits the allegations in

paragraph 6.


  7. Complaint:  Plaintiff Jonathan Reisman is, and at all times relevant hereto was, an individual residing in Orange County, Florida. During the Class Period, Plaintiff purchased AXR in Orange County for purposes other than resale.

  Answer:  Upon information and belief, Shire admits the allegations in paragraph

7.

8.      Complaint:  Defendant Shire U.S., Inc. is a New Jersey corporation with its principal place of business and headquarters at 725 Chesterbrook Blvd., Wayne, Pennsylvania 19087. Throughout the Class Period, Shire U.S., Inc. marketed and sold AXR in Florida and elsewhere. Upon information and belief, Shire U.S., Inc. is the manufacturer and distributor of Adderall XR. Further, upon information and belief, Shire U.S., Inc. maintains Shire's U.S. headquarters in Pennsylvania, and most of the wrongful conduct described herein emanated from Shire U.S., Inc.'s headquarters in Wayne, Pennsylvania. Throughout the Class Period, Shire U.S., Inc. marketed and sold AXR in Florida and elsewhere.

       Answer:  Shire admits that Shire US Inc., throughout the alleged class period,

it marketed and sold AXR in Florida and elsewhere.  Shire denies the remaining

allegations in paragraph 8.


9.      Complaint:  Defendant Shire LLC is a Kentucky limited liability company with its principal place of business at 9200 Brookfield Court, Florence, Kentucky 41042. Shire LLC is a successor entity to Shire Laboratories, Inc., a party to the anticompetitive reverse payment agreements at issue in this case. Shire LLC develops, manufactures, and sells brand and generic pharmaceutical products in the United States, including AXR. Throughout the Class Period, Shire LLC marketed and sold AXR in Florida and elsewhere.

       Answer:  Shire admits that Shire LLC is a Kentucky limited liability company

and a successor entity to Shire Laboratories Inc.  Shire denies the remaining

allegations in paragraph 9.


10.      Complaint:  The true names and capacities, whether individual, corporate, associated or otherwise of certain manufacturers, distributors, ███████████ ███████ or their alter egos sued herein as DOES 1 through 100 inclusive are presently unknown to Plaintiffs who therefore sue these Defendants by fictitious names. Plaintiffs will seek leave of this Court to amend the Complaint to show their true names and capacities when the same have been ascertained. Plaintiffs are informed and believe and based thereon alleges that DOES 1 through 100 were authorized to do and did business in Miami-Dade County. Plaintiffs are further informed and believe and based thereon alleges that DOES 1 through 100 were or are, in some manner or way, responsible for and liable to Plaintiffs for the events, happenings, and damages hereinafter set forth below.

Answer:   The allegations in paragraph 10 set forth legal conclusions for which no response is required.  To the extent a response is required, Shire denies the allegations in paragraph 10.

11.   Complaint:  Plaintiffs are informed and believe and based thereon allege that at all times relevant herein each of the Defendants was the agent, servant, employee, subsidiary, affiliate, partner, assignee, successor-in-interest, alter ego, or other representative of each of the remaining Defendants and was acting in such capacity in doing the things herein complained of and alleged.

Answer:   Shire admits that Shire LLC is wholly owned by Shire US Inc. Shire denies the remaining allegations in paragraph 11.

## III.   **JURISDICTION AND VENUE**

12.   Complaint:  This Complaint is brought pursuant to Florida's Deceptive and Unfair Trade Practices Law, Fla. Stat. § 501.201, et seq. ("FDUTPA"), to seek redress for Defendants' unfair methods of competition, unconscionable acts or practices, and unfair conduct in violation of state law.

Answer:   The allegations in paragraph 12 set forth legal conclusions for which no response is required.  To the extent a response is required, Shire denies the allegations in paragraph 12.

13.   Complaint:  This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because the matter in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and is a class action in which members of the Class of plaintiffs are citizens of a State different from the Defendants.

Answer:   Shire admits the allegations in paragraph 13.

14.   Complaint:  Defendants have sufficient minimum contacts with Florida or otherwise intentionally avails [sic] itself of the consumer markets within Florida through the promotion, sale, marketing, and/or distribution of its products in Florida to render the

exercise of jurisdiction by the Florida courts permissible under traditional notions of fair play and substantial justice.

Answer:  Shire admits the allegations in paragraph 14.

15.     Complaint:  Defendants transact business within this judicial district, and the interstate trade and commerce described herein is carried out, in substantial part, in this district. Plaintiff Reisman and numerous Class Members reside in this district, purchased AXR and were thereby injured and subjected to irreparable harm in this district. Defendants received substantial compensation and profits from sales of AXR in this district. Thus, their liability arose in part in this district. Venue is therefore appropriate under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b) and (c).

Answer:  Shire admits it transacts business within this judicial district.  On information and belief, Shire further admits Plaintiff Reisman resides in this district and purchased AXR in this district.  Shire denies the remaining allegations in paragraph 15.

## IV.   FACTUAL ALLEGATIONS

### A.   Adderall XR, Shire, and Generic Competition

16.     Complaint:  AXR is a once-a-day psychostimulant drug of the pherethylamine and amphetamine chemical classes indicated for treatment of attention deficit hyperactivity disorder (ADHD).

Answer:  Shire admits that AXR is a once daily central nervous system stimulant prescription medicine approved for the treatment of Attention Deficit Hyperactivity Disorder (ADHD). Shire further admits that AXR is a single-entity amphetamine product that combines the neutral sulfate salts of dextroamphetamine and amphetamine with the dextro isomer of amphetamine.  Shire denies the remaining allegations in paragraph 16.

6

17.     Complaint:    In 1996, Shire released Adderall in an instant release formulation. It quickly became popular as an alternative to methylphenidate (sold under the brand name Ritalin) for treatment of ADHD. Studies indicate that Adderall is slightly more potent and has a longer period of efficacy than Ritalin, especially at lower doses.

Answer:    Shire admits that it released Adderall in an instant release formulation in 1996.  Shire denies the remaining allegations in paragraph 17.

18.     Complaint:    In 2001, Shire introduced AXR, which added the additional convenience of once-a-day dosing.

Answer:    Shire admits that it introduced AXR in 2001.  Shire denies the remaining allegations in paragraph 18.

19.     Complaint:    AXR quickly became a major source of revenue and the flagship product for Shire. A small company founded in 1986, AXR transformed Shire into a major pharmaceutical company. In the decade following AXR's release, Shire's net sales topped $6 billion. AXR was a major source of Shire's sales, in 2008 alone accounting for over $1 billion in sales and nearly half of Shire's overall revenues.

Answer:    Shire admits that AXR accounted for over $1 billion in Shire sales revenue in 2008.  Shire denies the remaining allegations in paragraph 19.

20.     Complaint:    Other drug companies sought entry into the AXR markets.

Answer:    Shire lacks sufficient information to answer paragraph 20, and therefore denies it.

21.     Complaint:    In November 2002, Barr Pharmaceuticals (which was acquired by Teva Pharmaceuticals USA, Inc. and will subsequently be referred to as "Teva") filed an Abbreviated New Drug Application ("ANDA") with the U.S. Food and Drug Administration ("FDA") to manufacture and sell a generic formulation of AXR it had developed.

Answer:  Shire admits that in November 2002, Barr filed an ANDA to sell a generic formulation of AXR it had developed.  Shire denies the remaining allegations in paragraph 21.

22.    Complaint:  In September 2003, Impax Laboratories, Inc. ("Impax") filed an ANDA seeking to manufacture and sell its generic version of AXR.

Answer:  Shire admits that in September 2003, Impax filed an ANDA seeking to sell a generic version of AXR.  Shire denies the remaining allegations in paragraph 22.

23.    Complaint:   In November 2004, Colony Pharmaceuticals, Inc. ("Colony") notified Shire that it had submitted an ANDA.

Answer:  Shire admits the allegations in paragraph 23.

24.    Complaint:   In September 2006, Andrx Pharmaceuticals, LLC ("Andrx") notified Shire that it had submitted an ANDA.

Answer:  Shire admits that Andrx notified Shire in September 2006 that it had submitted an ANDA for an AXR product.  Shire denies the remaining allegations in paragraph 24.

25.    Complaint:  In December 2006, Sandoz, Inc. ("Sandoz") notified Shire that it had submitted an ANDA.

Answer:  Shire admits that Sandoz notified Shire in November, 2006 that it had submitted an ANDA for an AXR product.  Shire denies the remaining allegations in paragraph 25.

8

**B.**     **Shire's Sham Patent Office Petitioning and Sham Patent Litigation**

26.     <u>Complaint</u>:  In February 2003, Shire filed a patent suit against Teva, alleging infringement of its '819 patent ("Teva I"). Shire filed a subsequent case against Teva in September 2003, alleging infringement of its '300 patent ("Teva II"). Both cases were filed in the Southern District of New York.

<u>Answer</u>:  Shire admits that it filed patent suits against Barr in the Southern District of New York, alleging infringement of its '819 patent and '300 patent, respectively, in February and September 2003.  Shire denies the remaining allegations in paragraph 26.

27.     <u>Complaint</u>:  Shire filed another patent suit against Impax in December 2003, alleging infringement of its '819 and '300 patents for 30 mg dosage ("Impax I"). Shire filed a subsequent case against Impax in January 2005, relating to additional dosage forms under the '819 and '300 patents ("Impax II"). Both cases were filed in the District of Delaware.

<u>Answer</u>:  Shire admits that it filed patent suits against Impax in the District of Delaware alleging, alleging infringement of its '819 and '300 patents for 30 mg dosage, in  December 2003 and for additional dosage forms, in January 2005. Shire denies the remaining allegations in paragraph 27.

28.     <u>Complaint</u>:  Shire's litigation conduct further underscored its bad faith use of the '819 and '300 patent litigation to extend its monopoly. For example, the Court in Impax I issued its Markman Order affecting claim construction of the '819 and '300 patents in February 2005. The ruling rejected Shire's arguments regarding claim construction, and emboldened Impax in September 2005 to move for summary judgment.

<u>Answer</u>:  Shire denies the allegations in paragraph 28.

29.     <u>Complaint</u>:  In response to the unfavorable Markman Order, and in an effort to prevent the Court from ruling on Impax's Motion for Summary Judgment, Shire in March 2005 requested that the United States Patent Office "re-issue" its '819 and '300 patents pursuant to 35 U.S.C. § 251.

Answer:  Shire admits that in March 2005, it requested that the United States

Patent Office re-issue its '819 and '300 patents pursuant to 35 U.S.C. § 251.  Shire

denies the remaining allegations in paragraph 29.


30.    Complaint:  Shire unbelievably claimed that discovery in the Teva litigation, which had been on file for nearly two years, uncovered supposed errors in the '819 and '300 patents. Such was not the case, and Shire, when filing for reissuance, did not even change any of the 42 claims asserted in those patents, but instead added additional claims.

Answer:  Shire denies the allegations in paragraph 30.


31.    Complaint:  Shire then argued before the district court that the subsequent patent reissuance was a basis for the court in November 2005 to reconsider the Markman Order. Impax, in response, correctly characterized Shire's actions as "meritless" and "merely yet another desperate attempt to delay consideration of Impax's pending summary judgment motion."

Answer:  Shire denies the allegations in paragraph 31.


32.    Complaint:  The Court ultimately agreed with Impax, denying Shire's Motion for Reconsideration, and highlighting Shire's abusive "revolving door" strategy of using baseless administrative procedures to delay the Court's ability to resolve the patent litigation. As noted by the court:

> Moreover, the court agrees with Impax that allowing Shire to re-open claim construction may lead to a "revolving door," thereby indefinitely preventing the court from reaching a final decision in this litigation. Following Shire's rational to its endpoint, the court can envision a request for supplemental briefing and re-argument after every office action and response thereto until the reissue proceedings conclude. Thus, the Markman process may be never-ending, which would surely frustrate the court's efforts to achieve finality in this consolidated litigation.

*Shire Labs., Inc. v. Impax Labs, Inc.,* No. 03-1164 at *3 (D. Del. Jan. 13, 2006) (citing

*Shering Corp. v. Amgen, Inc.,* 25 F. Supp. 2d 293, 299 (D. Del. 1998)).

<u>Answer</u>:   Shire admits the quoted language in paragraph 32 is a partial excerpt from the cited opinion.  Shire denies the remaining allegations in paragraph 32.

33.   <u>Complaint</u>:   Nevertheless, the result of the purported "curing" of errors however was to greatly delay and hamper the court's ability to resolve the case in favor of the generic manufacturers on summary judgment. Put plainly, Shire's '819 and '300 infringement claims were an obvious sham filed to illegally extend its AXR monopoly.

<u>Answer</u>:  Shire denies the allegations in paragraph 33.

34.   <u>Complaint</u>:  In October 2005, Shire filed another patent suit, this time against both Teva and Impax and alleging infringement of its '768 patent ("Teva/Impax I"). This case was filed in the Southern District of New York.

<u>Answer</u>:  Shire admits the allegations in paragraph 34.

35.   <u>Complaint</u>:   Shire's '768 patent was not even listed in the FDA's Orange Book, so there unquestionably no basis [sic] for a patent suit by Shire. Under the Hatch-Waxman Act, a generic manufacturer has only infringed a patent if it is listed in the Orange Book; otherwise, generic manufacturers have a safe harbor in their preparation activities and there is no infringement until the generic manufacturer actually markets its product.

<u>Answer</u>:  Shire admits that the '768 patent was not listed in the FDA's Orange Book.  Shire denies the remaining allegations in paragraph 35.

36.   <u>Complaint</u>:  Further, the release-mechanism technology covered by the '768 patent, upon information and belief, was not even employed by Shire in the AXR product. Since the release mechanism covered by the '768 patent constituted a major change from those employed in AXR, it would not have even been possible (absent a bioequivalent test) for a product containing the '768 technology to be deemed bioequivalent to AXR. Both in procedure and in substance, the '768 patent suit was a sham meant to illegally extend Shire's AXR monopoly.

<u>Answer</u>:  Shire admits that AXR is an extended-release product.  Shire further admits that the '768 patent covers sustained-release forms of one or more

11

amphetamines and/or amphetamine salts.  Shire denies the remaining allegations in paragraph 36.

37.    Complaint:   In March 2006, Shire filed another patent case against Teva (because Teva had now merged with Barr), alleging (again) infringement of its '819 and '300 patents ("Teva II"). This time, Shire filed in the Eastern District of Pennsylvania.

    Answer:  Shire denies the allegations in paragraph 37.

38.    Complaint:   Shire filed similar suits alleging infringement of these patents against: Andrx in November 2006 ("Andrx I"); Sandoz in January 2007 ("Sandoz I"); and Colony in March 2007 ("Colony I").

    Answer:   Shire admits that it filed patent infringement suits against Andrx in November 2006, Sandoz in January 2007, and Colony in March 2007.  Shire denies the remaining allegations in paragraph 38.

39.    Complaint:   By filing suits alleging patent infringement, Shire was able to avail itself of various FDA regulations resulting in 30-month automatic stays of FDA's approval of the Teva and Impax ANDAs.

    Answer:   Shire admits that certain patent infringement suits resulted in 30-month automatic stays of FDA's approval of the Barr and Impax ANDAs.  Shire denies the remaining allegations in paragraph 39.

40.    Complaint:   Upon information and belief, Shire's patent litigation (which consisted of not one but multiple suits (which individual competitors subjected to not one but multiple suits) was a sham, asserting a patent that is invalid, void or otherwise unenforceable, and Shire used the patent litigation to extend the time during which it maintained a monopoly knowing that its monopoly was in jeopardy. Shire's conduct evidences a clear pattern whereby Shire would use all means necessary to prevent courts from ruling on the merits of its suits.

    Answer:  Shire denies the allegations in paragraph 40.

12

41.     Complaint:   Many of the suits filed by Shire were barely litigated, if at all. For example, Shire filed Teva III on March 2, 2006. Other than the complaint, Teva's answer and Shire's answer to Teva's counterclaim, no other substantive pleadings were filed by Shire, until a settlement agreement was entered in March 2008, two full years after litigation commenced.

Answer:  Shire denies the allegations in paragraph 41.

42.     Complaint:   Shire's motivation is obvious. Absent its sham litigation and dilatory litigation tactics, the patent litigation may have been resolved in favor of Teva or Impax before the conclusion of the 30-month stays, or the generic manufacturers might proceed to take the drug to market at conclusion of the stay "at risk" even while the patent lawsuits were pending. Of course, the available of a much cheaper generic would have profound implications for Shire's bottom line, likely causing it to lose ninety (90) percent of the market share for its blockbuster drug.

Answer:  Shire denies the allegations in paragraph 42.

**C.     Shire's Multiple Sham Citizen Petitions**

43.     Complaint:   Shortly after Impax moved for summary judgment, Shire on or about October 12, 2005 filed a frivolous Citizen Petition with the FDA.

Answer:  Shire denies the allegations in paragraph 43.

44.     Complaint:   In its initial Citizen Petition, Shire requested that ANDAs for AXR (1) have identical plasma pharmacokinetic ("PK") profiles, (2) have identical PK profiles through partial area under the curve ("AUC-) measurements during early exposure, (3) establish bioequivalence in the pediatric population, and (4) conduct clinical efficacy studies in absence of identical plasma concentration-time PK profiles.

Answer:  Shire admits that in 2005 it filed a Citizen Petition with the FDA

requesting that ANDAs for AXR (1) have identical plasma pharmacokinetic profiles,

(2) have identical PK profiles through partial area under the curve measurements

during early exposure, (3) establish bioequivalence in the pediatric population, and

13

(4) conduct clinical efficacy studies in absence of identical plasma concentration-time PK profiles. Shire denies the remaining allegations in paragraph 44.

45.     Complaint:  Shire's Citizen Petition was objectively baseless. Indeed, Shire's Citizen Petition requested that the FDA completely disregard the entire regulatory framework for the approval of generic drugs, even demanding clinical efficacy trials for generic manufacturers and unnecessary bioequivalence testing on children. In essence, Shire's Citizen Petition asked the FDA to require that the generic filers meet the burdens of an NDA for an innovator product, and not the lesser ANDA burdens for a generic equivalent.

       Answer:  Shire denies the allegations in paragraph 45.

46.     Complaint:  Shire submitted its Citizen Petition solely with the intent to delay FDA approval of the generic AXR ANDAs at the time Shire's sham patent litigation was losing steam (as Impax had recently moved for summary judgment following the Markman Order in Impax I). Had Shire truly been motivated by the substance of its Citizen Petition, it could have filed it years earlier when Teva and Impax first served Shire Paragraph IV Certifications.

       Answer:  Shire denies the allegations in paragraph 46.

47.     Complaint:  Then, in a further effort to slow down the FDA, Shire on January 19, 2006 filed yet another Citizen Petition under the guise of "supplementing" its earlier Citizen Petition. In its Second Citizen Petition, Shire provided a 1,452 page bioavailability study that was, upon information and belief, conducted for a completely different product in Shire's pipeline, Adderall XL (a 16-hour release version of Adderall that was tentatively approved by the FDA in May 2007).

       Answer:  Shire denies the allegations in paragraph 47.

48.     Complaint:  Shire's Second Citizen Petition was objectively baseless. The study provided by Shire, purportedly submitted by Shire in its Second Citizen Petition to support its demands of more rigorous bioequivalence testing, was not designed to test the effectiveness of AXR bioequivalence measures and had entirely different clinical endpoints than traditional bioequivalence testing. Any application to AXR was purely hypothetical, but nevertheless the submission of a 1,452 page study would slow down the FDA.

       Answer:  Shire denies the allegations in paragraph 48.

14

49.    <u>Complaint</u>:  Shire's Second Citizen Petition was submitted by Shire solely to set back FDA approval of the generic AXR ANDAs.

     <u>Answer</u>:  Shire denies the allegations in paragraph 49.

50.    <u>Complaint</u>:  Predictably, the overburdened FDA was unable to process the sheer volume of information Shire provided to review, and on April 17, 2006 the FDA notified the parties that it would need additional time to review the information provided by Shire. Further, as noted below, Shire created incentives for its generic competitors to stop pursuing ANDA approvals, which on information and belief led to a significant delay in the FDA's resolution of the Citizen Petition.

     <u>Answer</u>:  Shire admits that on April 17, 2006, the FDA notified Shire that it would need additional time to review the information provided by Shire.   Shire denies the remaining allegations in paragraph 50.

51.    <u>Complaint</u>:  Remarkably, on March 22, 2012, Shire filed yet another Citizen Petition. In it, Shire sought: (1) deconvultion [sic] studies demonstrating comparability of the biomodal drug absorption profiles, (2) an FDA advisory committee meeting addressing partial AUC metrics, and (3) additional AUC measurements at 1.5 and 3 hours.

     <u>Answer</u>:  Shire denies the allegations in paragraph 51.

52.    <u>Complaint</u>:  Shire's Third Citizen Petition was objectively baseless. Again, Shire made requests that upset the entire regulatory framework of generic drugs.

     <u>Answer</u>:  Shire denies the allegations in paragraph 52.

53.    <u>Complaint</u>:  Shire's Third Citizen Petition was made solely by Shire with the intent to delay FDA approval of generic AXR. Indeed, as the FDA would note in its response, Shire's Third Citizen Petition was even inconsistent with its previous Citizen Petitions.

     <u>Answer</u>:  Shire denies the allegations in paragraph 53.

54.    <u>Complaint</u>:  On June 22, 2012, the FDA responded and denied every single specific request made by Shire in its three Citizen Petitions.  In its denial, the FDA noted

15

Shire's process of filing multiple Citizen Petition which effectively created a perpetually moving target for FDA personnel, remarking that it was "unclear whether the requests in [Shire's] 2012 Supplement replace[d Shire's] original requests or [were] offered in the alternative."

Answer:  Shire admits that the FDA responded to its Citizen Petition on June

22, 2012.  Shire denies the remaining allegations in paragraph 54.

## D.  Shire's CEO Brags About Its Abusive And Illegal Tactics To Thwart Generic Competition In The AXR Market

55.  Complaint:  If there was any doubt regarding Shire's subjective motivation for all of its delay tactics, that was settled in November 2005 when Shire's then-CEO, Matt Emmens, gave a remarkably candid interview in which he bragged about Shire's efforts to thwart generic competition for AXR:

> The US is also where the lawyers are, and Mr. Emmens has had to spend a lot of time with them as Shire tries to defend its patents on Adderall, which most analysts forecast will face copycat competition after a courtroom showdown beginning in January. If a copycat version is allowed on the market, Adderall prices will certainly collapse. US parents, insurers and healthcare authorities might very much like that. Mr. Emmens' task is to delay that until Shire's new products have established themselves.

> Pharmaceuticals companies expend a great deal of brainpower on tactics for maintaining their monopoly positions, and Shire is trying every tactic in the book. It is pretty pleased with itself to date. It has filed extra patents on the way Adderall is made and is suing the generic drug makers for infringement of that and other patents. And it is asking regulators to insist that the generics firms conduct human trials before being allowed to launch. This last tactic is "pretty elegant", Mr. Emmens says with a smile.

> He has experience of this sort of battle, having worked in the joint venture between Merck of the US and Astra of Sweden which developed Prilosec, an ulcer drug which became the world's bestselling medicine. AstraZeneca managed to tie up the manufacturers of generic Prilosec In [sic] the courts for

16

> nearly two years after the core patents expired, thanks to a plan
> put in place many years before.

Stephen Foley, *Matt Emmens: Shire Pharmaceuticals chief focuses his attention on drugs*

*deficit,* The Independent, Nov. 12, 2005.

> Answer:  Shire admits that the quote in paragraph 55 appears in the cited
> article.  Shire denies the remaining allegations in paragraph 55.

**E.**     **Shire's Reverse Payment Agreements with Teva and Impax**

56.     Complaint:  In 2006, with defeat looming it its [sic] baseless patent suits, Shire settled the patent litigation with Teva and with Impax. As part of the voluntary settlements, Shire made various payments to both Teva and Impax and the generic manufacturers agreed not to launch any generic AXR products until April (Teva) and October (Impax) of 2009. Thus, Shire was able to extend its monopoly for three more years.

> Answer:  Shire admits that it settled the patent litigation with Barr and with
> Impax in 2006 and that as part of those settlements, Barr/Teva agreed not to launch
> any generic AXR products until a date set forth in the Barr License Agreement and
> Impax agreed not launch any generic AXR products until a date set forth in the
> Impax License Agreement.  Shire denies the remaining allegations in paragraph 56.

57.     Complaint:



> Answer:  Shire denies the allegations in paragraph 57.

58.   Complaint:  As a further payment to delay Teva's entry date, Teva and Shire, on or about the very day that the License Agreement for AXR was signed, also entered into a "separate" product acquisition and license agreement whereby Shire sold the immediate release version of Adderall ("Adderall IR") to Duramed, a subsidiary of Barr/Teva. In exchange, Duramed entered into a "product development agreement" to develop products. ███████████████████████████████████████████████████████████████████ ███████████

Answer:  Shire admits that it sold the immediate release version of Adderall

("Adderall IR") to Duramed, a subsidiary of Barr, contemporaneously with the Barr

Settlement.   Shire further admits that in entered a product development agreement

with Duramed contemporaneously with the Barr Settlement.   Shire denies the

remaining allegations in paragraph 58.

59.   Complaint:  By making these, and other, payments of many millions of dollars to Barr/Teva, which held first to file exclusivity, Shire was able to delay both Barr/Teva's launch as well as Impax's launch, which was dependent on Barr/Teva's entry date.

Answer:  Shire denies the allegations in paragraph 59.

60.   Complaint:  However, upon information and belief, Shire also made disguised payments to Impax. Shire and Impax entered into a ██████████ co-promotion agreement for Shire's Carbatrol product. As with Shire's Duramed agreement, it was executed on or about the same day as Shire's License Agreement with Impax. ███████████████████████████ ███████████████████████████ Upon information and belief, the benefits of this co-promote agreement skewed heavily in favor of Impax, and was yet another vehicle by which Shire made disguised payments in order to delay generic entry.

Answer:  Shire admits that it entered a promotional services agreement with

Impax concerning Shire's Carbatrol product, contemporaneously with the Impax

Settlement.  Shire denies the remaining allegations in paragraph 60.

18

61.     Complaint: ████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████

        Answer:  Shire denies the allegations in paragraph 61.


62.     Complaint:  The patent litigation settlement agreements further misleadingly
sought to create the misimpression that Shire's patents were valid and that the generic
manufacturers' products actually infringed the patents. In the agreements, Shire agreed to
provide Teva and Impax with patent licenses so that they could legally sell Shire's
formulation of AXR as an Authorized Generic in 2009, in the event the FDA had not yet
approved Teva's and Impax's ANDA's for their own generic AXR. Shire would receive a
royalty payment based on sales of its authorized generic AXR sold by Teva and/or Impax.
Thus Shire retained complete control over the supply of AXR profiting from sales of the
Brand and Authorized Generic product.

        Answer:  Shire admits that the Barr and Impax Settlements each contained

provisions for Shire to supply the respective generics with AXR as an authorized

generic in the event the FDA had not yet approved Barr/Teva's and Impax's

respective ANDA's for their own generic AXR when their respective launch dates

arrived.  Shire denies the remaining allegations in paragraph 62.


63.     Complaint:  Shire thus created a strong disincentive for Teva and Impax to
pursue ANDA approval. Shire's offer to manufacture, bottle, and supply the authorized
generic product promised to save Impax and Teva significant costs. ██████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████████████████

        Answer:  Shire denies the allegations in paragraph 63.


64.     Complaint:  Indeed, upon information and belief, ███████████████████
████████████████████████████████████████████████████████████

Answer:  Shire denies the allegations in paragraph 64.

65.    Complaint:  Thus, the settlement agreements blocked generic competition after Shire's patents expired, and in that way excluded competition beyond the scope of exclusion intended by the patents.

Answer:  Shire denies the allegations in paragraph 65.

66.    Complaint:  Meanwhile, under the agreements, Shire would receive a royalty payment based on sales of its authorized generic AXR sold by Teva and/or Impax. Thus Shire retained complete control over the supply of AXR profiting from sales of the Brand and Authorized Generic product.

Answer:  Shire admits that under the Barr and Impax Settlements, if Shire

supplied authorized generic AXR to Barr/Teva and/or Impax, Barr/Teva (for the first

180 days) and/or Impax would pay Shire a payment based on its respective sales of

authorized generic AXR.  Shire denies the remaining allegations in paragraph 66.

67.    Complaint:  Upon information and belief, the parties entering the agreement understood that the generic manufacturers would not pursue approval of their ANDAs, which would ensure that Shire would control 100% of the supply (and thus the market) of AXR.

Answer:  Shire denies the allegations in paragraph 67.

68.    Complaint:    Further, the agreement contained a requirement contract component, in that Shire agreed to meet Teva's and Impax's supply requirement and provide AXR directly to the two generic companies. Because the FDA had not yet approved the Teva and Impax ANDAs in 2009 (due to Shire's sham governmental petitioning and the generics non-pursuit of ANDA approval), they would sell AXR manufactured by Shire as Authorized Generics.

20

         <u>Answer</u>:  Shire denies the allegations in paragraph 68.

69.   <u>Complaint</u>:  Shire thus began to supply generic AXR to Teva in April 2009. Impax's license to sell the product became effective on October 1, 2009, the 181st day after Teva launched.

         <u>Answer</u>:  Shire admits that it began to supply generic AXR to Teva in April 2009 and Impax's license to sell the product became effective on October 1, 2009. Shire denies the remaining allegations in paragraph 69.

70.   <u>Complaint</u>:  The only difference between brand-name and generic AXR would be the trade dress and the price of each product. Shire continued to sell the brand product at a substantially higher price than the Authorized Generic. This further underscores the anticompetitive reasons that Shire was able to maintain such a large market share even though their product was much more expensive yet identical to that marketed by Teva and Impax.

         <u>Answer</u>:  Shire admits that it continued to sell branded AXR after Shire-supplied authorized generic AXR launched. Shire denies the remaining allegations in paragraph 70.

71.   <u>Complaint</u>:  Further, the agreement between Shire and Teva had immediate and foreseeable effects beyond simply eliminating generic competition from Teva. As the first generic producer to submit an ANDA application to market generic AXR, Teva obtained the benefit of the 180-day marketing exclusivity period under the Hatch-Waxman Act: no other generic manufacturer could obtain FDA approval to market generic AXR until this exclusivity period had expired. This exclusivity period would expire [sic], however, until 180 days after Teva began to market its generic product.

         <u>Answer</u>:  The allegations in paragraph 71 set forth legal conclusions for which no response is required.  To the extent a response is required, Shire denies the allegations in paragraph 71.

72.    <u>Complaint</u>:   Shire gave Teva consideration on the understanding that Teva would never complete or at least delay the steps necessary to trigger this 180-day period, thereby effectively barring any generic competitors from entering the market.

Answer:  Shire denies the allegations in paragraph 72.

73.    <u>Complaint</u>:   In doing so, the Shire-Teva agreement created anticompetitive effects beyond the scope of Shire's patents, and had the effect of preventing any generic competition in the market, constituting a conspiracy to restrain trade.

Answer:  Shire denies the allegations in paragraph 73.

74.    <u>Complaint</u>:   Upon information and belief, the three-year extension of Shire's monopoly imposed a substantial cost on consumers and conferred a benefit to Shire. Through the settlement agreements, Shire provided consideration to Teva and Impax in exchange for their delay into the market.

Answer:  Shire denies the allegations in paragraph 74.

75.    <u>Complaint</u>:   Other generic manufacturers followed Teva and Impax by filing ANDAs for generic AXR, and Shire treated them in the same manner as it did Teva and Impax, by filing sham patent infringement litigation and then reaching settlements prior to any ruling on the validity of Shire's patents.

Answer:  Shire denies the allegations in paragraph 75.

76.    <u>Complaint</u>:   The patent infringement litigations proceeded mostly under seal, and the nature of these settlement agreements and related side deals and reverse payment arrangements in order to delay generic entry were fraudulently concealed from the public and from Plaintiffs.

Answer:  Shire denies the allegations in paragraph 76.

**F.    <u>Shire's Intentional Breach of Supply Agreements</u>**

77.    <u>Complaint</u>:   Even after enjoying an extended monopoly over the market, on information and belief, Shire thereafter willfully breached its agreements with Teva and Impax by limiting the supply of the AXR product, such that Teva and Impax were unable to meet demand for the Authorized Generic.

22

Answer:  Shire denies the allegations in paragraph 77.

78.    Complaint:  Shire refused to supply AXR to Teva in violation of the Shire-Teva agreement. Upon information and belief:

a.    Teva introduced its generic AXR product in [sic] April 1, 2009 at prices below those charged for brand name AXR, and quickly acquired a majority (approximately sixty percent) of the AXR market.

b.    As required by their agreement with Shire, Teva on or around July I, 2009 sent Shire a 12-month forecast of the predicted supply of AXR Teva would need. Along with that forecast was a purchase order (binding on Shire) for the months of October, November, and December 2009.

c.    Shire, however, refused to honor the binding purchase order, and on or around August 28, 2009 notified Teva that it would not deliver the amount requested in the purchase order and would be delivering instead a much lower amount. Shire's decision was motivated by a desire to keep product for itself. ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████.

d.    ████████████████████████████████ ██████████████████████████████████ In other words, Shire's notification caused Teva to begin rationing its generic AXR product, causing retail shortages as early as August 2009.

e.    ████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████

f.    Then, on or around October 2, 2009, Shire notified Teva that it would not even be providing the much-lower amounts of AXR it had promised in August. Meanwhile, Shire continued to provide the market with AXR to be sold under its brand-name (and more expensive) label, ████████████████████ In short, through its anti-competitive behavior, Shire forced consumers to purchase an identical product for a much higher price.

23

g. ████████████████████
███████████████████████████████████

h.      By failing to deliver the amount of AXR purchased in the July 2009 purchase order, Shire breached its agreement with Teva. This breach continued via Shire's practice of restricting the supply from August 2009 on with the purpose and effect of hindering Teva's ability and incentive to compete in the AXR market.

Answer:  Shire denies the allegations in paragraph 78.

79.    Complaint:  Shire also refused to supply AXR to Impax in violation of the Shire-Impax agreement. Upon information and belief:

a.      Impax, whose AXR product was scheduled to debut on or around October 1, 2009, notified Shire in the months leading up to October of its intent to rely upon Shire to supply Impax's AXR product. On information and belief, Impax timely submitted its purchase order for the amount needed for the initial launch, and continued to timely submit purchase orders thereafter based upon its forecasts.

b.      Starting in 2009, Shire failed to timely fill Impax's purchase orders. Upon information and belief, the problem intensified in 2010 when Shire not only failed to timely deliver product, but in many instances delivered less than what was ordered or delivered none at all. These repeated breaches of the agreement had the purpose and effect of hindering Impax's ability and incentive to compete in the AXR market.

c.      According to court documents filed by Impax, Shire's behavior had devastating effects. As noted by the company:

> Impax consistently lacked sufficient supply of generic AXR. As a result of this lack of supply, Impax was unable to fill many of its customers' purchase orders. Impax also was forced to ration product to its customers or delay delivering product to its customers as a result of Shire's failure to supply. Impax's customers would have ordered more generic AXR if it were available. On several occasions, customers approached Impax seeking to purchase more generic AXR, but Impax had to turn them away before any purchase orders were placed because it had no stock available.
> ….
> As a result of Shire's failure to supply Impax with generic AXR, Impax lost sales to existing customers, lost the opportunity to execute more favorable contracts with its

24

> customers, and was unable to solicit additional customers.
> ….
> By starving Impax of supply, Shire ensured that Impax could
> not compete. Without sufficient supply Impax was unable to
> fill the orders of its customers, unable to provide those
> customers with additional product they wanted to buy, and
> unable to solicit new customers. Shire, on the other hand, has
> been able to line its pockets with tens of millions of dollars
> every month from sales of branded AXR by refusing to fill
> Impax's orders and keeping supply for itself. Indeed, as a
> result of Shire's actions, more than two years after generic
> entry, Shire's branded AXR accounts for approximately 40%
> of the total AXR market.

Answer:  Shire admits that portions of the language quoted in paragraph 79(c)

are found in different Impax-prepared documents. Shire denies the remaining

allegations in paragraph 79.

80.    Complaint:   Upon information and belief, had Shire met its obligation to
supply AXR to Teva and Impax, the generic manufacturers would have captured roughly
ninety (90) percent of the market. But in or around August 2009, Shire began improperly
limiting the supply of AXR to the generic manufacturers, such that they were only able to
capture little more than half of the market.

Answer:  Shire denies the allegations in paragraph 80.

**G.**    ███████████████████████████████████
█████████████

81.    Complaint:  Their breach of the supply contracts aside, ███████████
█████████████████████████████████████

Answer:  Shire denies the allegations in paragraph 81.

82.    Complaint:   As noted above, Shire had complete control over how AXR is
manufactured and distributed among itself, Teva, and Impax. ████████████████
█████████████████████████████████████



Answer: ███████████████████████████

████████████████████████████████ Shire denies

the remaining allegations in paragraph 82.

83.    Complaint:

Answer:  Shire denies the allegations in paragraph 83.

84.    Complaint:

Answer:  Shire denies the allegations in paragraph 84.

85.    Complaint:

Answer:  Shire denies the allegations in paragraph 85.

86.

Answer:  Shire denies the allegations in paragraph 86.

87.    Complaint:  

Answer:  Shire denies the allegations in paragraph 87.

88.    Complaint:

Answer:  Shire denies the allegations in paragraph 88.

89.    Complaint:

Answer:  Shire denies the allegations in paragraph 89.

**H.**

90.    Complaint:

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ██████████ ██████████ because Plaintiffs do not have standing to pursue those allegations.

Therefore, the allegations in paragraph 90 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 90.

91.    <u>Complaint</u>:



<u>Answer</u>:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇  because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 91 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 91.

92.    <u>Complaint</u>:



<u>Answer</u>:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇  because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 92 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 92.

93.   <u>Complaint</u>: 

<u>Answer</u>:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ▮▮▮▮▮▮ ▮▮▮▮▮▮ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 93 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 93.

94.   <u>Complaint</u>: 

<u>Answer</u>:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ▮▮▮▮▮▮ ▮▮▮▮▮▮ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 94 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 94.

95.   <u>Complaint:</u> 

    Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ███████ ████████ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 95 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 95.

96.   Complaint:

    Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ███████ ████████ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 96 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 96.

97.   Complaint:



Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ██████████ ██████████ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 97 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 97.

98.   Complaint: ██████████

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ██████████ ██████████ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 98 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 98.

99.   Complaint: ██████████

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ██████████ ████████ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 99 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 99.

100.   Complaint:



Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ██████████ ████████ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 100 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 100.

101.   Complaint:

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ██████████

███████████ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 101 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 101.

102.   Complaint: ████████████████████████████████████
████████████████████████████

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ████████████ ███████████ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 102 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 102.

103.   Complaint: ████████████████████████████████████
████████████████████████████

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ████████████ ███████████ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 103 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 103.

104.   Complaint: ████████████████████████████████████



Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ████████████ ████████████ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 104 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 104.

105.   Complaint:  ██████████████████████

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ████████████ ████████████ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 105 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 105.

106.   Complaint:  ██████████████████████

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ████████████ ████████████ because Plaintiffs do not have standing to pursue those allegations.

Therefore, the allegations in paragraph 106 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 106.

107.   Complaint:



Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 107 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 107.

108.   Complaint:



Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' allegations directed at ▮▮▮▮▮▮▮ ▮▮▮▮▮▮ because Plaintiffs do not have standing to pursue those allegations. Therefore, the allegations in paragraph 108 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 108.

109.   Complaint:

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's

Motion to Dismiss dismissed Plaintiffs' allegations directed at ██████████████

██████████   because Plaintiffs do not have standing to pursue those allegations.

Therefore, the allegations in paragraph 109 do not require a response.  To the extent a

response is required, Shire denies the allegations in paragraph 109.

**I.      The Supply Shortage and Monopoly Created by Defendants' Conduct**

110.   Complaint:   The supply shortage of generic AXR is attributable entirely to
Shire's wrongful conduct.

Answer:  Shire denies the allegations in paragraph 110.

111.   Complaint:   As a Schedule II controlled substance, AXR is subject to
procurement quota limitations set by the U.S. Drug Enforcement Agency [sic] ("DEA"). In
deciding how much quota to grant, DEA considers, among other factors, past and current
market dynamics, forecasts of future sales, as well as how much of the drug is currently in
the distribution chain.

Answer:   The allegations in paragraph 111 set forth legal conclusions for

which no response is required.  To the extent a response is required, Shire denies the

allegations in paragraph 111.

112.   Complaint:   In an effort to temper outrage at the supply shortage caused by
Shire, Shire publicly ████████████████████████████████████████████████████████
claimed that the U.S. Drug Enforcement Agency [sic] ("DEA") was responsible for the AXR
shortage. This excuse however was roundly rejected by the DEA itself in 2012, who stated
that "[a]ny shortage of these products is therefore a result of decisions made by industry [i.e.,
Shire] regarding manufacturing or distribution."

Answer:  Shire denies the allegations in paragraph 112.

113.   <u>Complaint</u>:  Shire can offer no justification for its conduct, and the DEA has rejected the notion that the AXR shortage was due to the DEA's failure to set a manufacturing quota high enough to meet demand.

Answer:  Shire denies the allegations in paragraph 113.

114.   <u>Complaint</u>:  Upon information and belief, the AXR shortage was the result of Shire's management who created the shortage in order to increase the brand name market for the drug,



Answer:  Shire denies the allegations in paragraph 114.

115.   <u>Complaint</u>:  As evidence of Shire's anticompetitive effect, Shire in late 2010 was actually able to raise the price of AXR. Even after raising the prices and increasing its own revenue, Shire still refused to reallocate the supply of AXR to Teva and Impax.        In this sense, Shire's breach of its supply agreements allowed it to charge artificially inflated prices. Even while Shire raised its prices, it was able to increase its market share.

Answer:  Shire denies the allegations in paragraph 115.

116.   <u>Complaint</u>:  As a result, Shire reported in the third quarter of 2010 that AXR sales had increased forty-one (41) percent to $99.7 million (for the quarter). The sales numbers continued to climb, and in the first two quarters of 2011 Shire reported AXR sales of $111 million and $146.9 million.

Answer:  Shire admits that it reported third quarter 2010 earnings reflecting an AXR sales increase of 41 percent and $99.7 million quarterly revenue and that it further reported first quarter 2011 earnings reflecting AXR quarterly sales of $111 million and second quarter 2011 earnings reflecting AXR quarterly sales of $146.9 million.  Shire denies the remaining allegations in paragraph 116.

117.    Complaint:  While Shire's profits soared, millions of Americans with ADHD suffered. The American Academy of Child and Adolescent Psychiatry, in remarks to the New York Times in 2011, stressed that the shortages, "widespread across a number of states," were having a "devastating" impact on patients.

Answer:  Shire admits that a 2011 New York Times article attributed the quote in paragraph 117 to the American Academy of Child and Adolescent Psychiatry, referring to multiple manufacturers announcing that their medicines were in short supply.  Shire denies the remaining allegations in paragraph 117.

118.    Complaint:    The objectively and subjectively baseless nature of Shire's multipronged delay strategy soon provoked reactions from the U.S. Attorney's Office, the generic manufacturers, as well as Congress.

Answer:  Shire denies the allegations in paragraph 118.

119.    Complaint:   In 2009, The U.S. Attorney's Office for the Eastern District of Pennsylvania launched a civil investigation relating to Shire's AXR sales and marketing practices. Recently, the action was resolved and Shire had to pay a $57.5 million fine to the U.S. government.

Answer:  Shire denies the allegations in paragraph 119.

120.    Complaint:   In late 2010, Impax sued Shire alleging anticompetitive conduct surrounding Shire's breach of the supply agreements.

Answer:    Shire admits that Impax sued Shire in 2010 for conduct related to Shire's agreement to supply Impax with authorized generic AXR.  Shire denies the remaining allegations in paragraph 120.

121.    Complaint:   After extensive discovery, Impax in February 2013 achieved a favorable result, and Shire agreed to supply Impax with AXR as well as pay $48 million in damages.

38

Answer:   Shire agrees that it settled with Impax in February 2013.   Shire

denies the remaining allegations in paragraph 121.

122.   Complaint:   Notably, Shire did not argue nor did the Court accept Shire's position, taken in subsequent cases, that federal patent law immunizes Shire's intentional breach of contract.

Answer:  Shire admits that it did not argue to the Court in the Impax contract

litigation that federal patent law immunizes liability for breach of contract.   Shire

denies the remaining allegations in paragraph 122.

123.   Complaint:   As more details about Shire's conduct became public, Congress also took action. On January 17, 2012, ranking House members, in an open letter to Shire's CEO, expressed their concern that Shire "might be manipulating the market for [AXR]." The effect of Shire's policy, the authors noted, "could be to force consumers who need Adderall XR to pay for an expensive brand-name product rather than a less generic drug." Indeed, this is precisely what Shire accomplished through its schemes to delay generic entry, starve the generics of supply, and ████████████████████████████████

Answer:   Shire admits that a January 17, 2012, letter from certain House

members to Shire's CEO contains the language quoted in paragraph 123.   Shire

denies the remaining allegations in paragraph 123.

124.   Complaint:   While Shire, in acknowledgment of its anticompetitive conduct, has both paid fines to the U.S. Government and settled with generic manufacturers, there has been no redress for the millions of consumers (indirect purchasers) who suffered as a result of Shire's conduct.

Answer:  Shire denies the allegations in paragraph 124.

**J.     Effect on Interstate Commerce, Market Power, and Competition**

125.   Complaint:    At all relevant times, Defendants manufactured, sold, and shipped AXR across state lines including into Florida.

39

Answer:  Shire admits that at all relevant times, it sold and shipped AXR across state lines including into Florida.  Shire denies the remaining allegations in paragraph 125.

126.   Complaint:   At all relevant times, in connection with its sales of AXR, monies, contracts, bills, and business communications were transmitted continuously and uninterruptedly across state lines, including into Florida.

Answer:  Shire admits the allegations in paragraph 126.

127.   Complaint:   At all relevant times, various devices were employed to commit the illegal acts described herein, including U.S. mail, interstate travel, interstate telephone communications, and interstate commerce. Defendants' complained-of activities occurred within the stream of, and have substantially affected, interstate commerce.

Answer:  Shire denies the allegations in paragraph 127.

128.   Complaint:   In this case, as alleged herein, there is direct proof of Defendants' monopoly power over the price of AXR. This direct proof includes, but is not limited to: (a) Shire's exclusion of competition from the market by way of its agreements with Teva and Impax; (b) Shire's exclusion of competition from the market by way of Shire's refusal to honor the supply agreements with Teva and Impax; (c) ████████████████████████████ ████████████████████████████████████████████████████████████████████ (d) Shire's unprecedented market share for AXR after generic drugs are introduced into the marketplace; (e) Shire's status as the only supplier of AXR; (f) price data demonstrating Shire's ability to raise its prices without losing sufficient sales to render the price increases unprofitable; and/or (g) the lack of non-AXR drug products that can be reasonably substituted for AXR.

Answer:  Shire denies the allegations in paragraph 128.

129.   Complaint:   The relevant product market is Adderall XR and its generic equivalents, in all forms and dosage strengths.

Answer:  Shire denies the allegations in paragraph 129.

130.  Complaint:  The relevant geographic market is nationwide. Through the illegal conduct described herein, Defendants were able to charge artificially high prices without losing substantial sales, and thus, by definition, maintained monopoly power over AXR products sold in the United States and Florida.

Answer:  Shire denies the allegations in paragraph 130.

131.  Complaint:  Through the illegal conduct described herein, Defendants intentionally, purposefully, and successfully suppressed competition. Defendants' exclusionary conduct suppressed the sale of AXR in the United States and Florida, and unlawfully enabled Defendants to sell AXR Product at artificially inflated prices.

Answer:  Shire denies the allegations in paragraph 131.

132.  Complaint:  If Teva and Impax had effectively competed with Defendants, they would have captured a much greater share of the overall AXR market than Defendants, and Plaintiffs and Class Members would have substituted more lower-priced AXR for the higher-priced brand name AXR.

Answer:  Shire denies the allegations in paragraph 132.

133.  Complaint:  During the relevant time period, Plaintiffs and Class Members purchased AXR indirectly from Defendants. As a result of Defendants' anticompetitive and illegal conduct, Plaintiffs and Class Members had to pay more money in the form of higher prices or co-pays for "brand name" medication even though it was precisely the same as the generic medication. This is because Plaintiffs and Class Members were deprived of the ability to purchase lower-priced generic AXR or Authorized Generic Adderall at competitive market prices.

Answer:  On information and belief, Shire admits that Plaintiffs purchased AXR indirectly from Shire.  Shire denies the remaining allegations in paragraph 133.

134.  Complaint:  Thus Plaintiffs and the Class Members, as a result of Defendants' illegal conduct, have suffered monetary losses and damages.

Answer:  Shire denies the allegations in paragraph 134.

41

**K.**     **Factual Allegations as to Named Plaintiffs**

135.     <u>Complaint</u>:  Monica Barba, a resident of Miami-Dade County, was prescribed AXR on or around February 2009, and continues to take it periodically through the present.

     <u>Answer</u>:   On information and belief, Shire admits that Monica Barba is a resident of Miami-Dade County, was prescribed AXR on or around February 2009. Shire is without information to admit or deny the remaining allegations in paragraph 135, and therefore denies them.

136.     <u>Complaint</u>:  Ms. Barba had an insurance policy through Aetna. Under the policy, Ms. Barba had to spend significantly more for brand name medication where there was an FDA-approved generic. The co-pay for brand name medications, the amount Ms. Barba had to spend, was more for brand-name drugs than for generic drugs.

     <u>Answer</u>:  Upon information and belief, Shire admits that Ms. Barba had an insurance policy through Aetna.   Shire denies the remaining allegations in paragraph 136.

137.     <u>Complaint</u>:  Plaintiff Barba was an indirect purchaser of AXR.

     <u>Answer</u>:  On information and belief, Shire admits the allegations in paragraph 137.

138.     <u>Complaint</u>:  On numerous occasions during the Class Period, Plaintiff Barba was unable to procure generic AXR due to a lack of generic supply, and had to expend considerably more personal funds to purchase the brand name AXR.

     <u>Answer</u>:  Shire denies the allegations in paragraph 138.

139.     <u>Complaint</u>:  Jonathan Reisman, a resident of Orange County, was prescribed AXR on or around late 2005 / early 2006. He continued to take AXR through 2009.

42

Answer:  On information and belief, Shire admits that Jonathan Reisman is a resident of Orange County, was prescribed AXR in or before 2008 and continued to take AXR through 2009.  Shire is without information to admit or deny the remaining allegations in paragraph 139, and therefore denies them.

140.   Complaint:  Mr. Reisman had an insurance policy through Aetna. Under the policy, Mr. Reisman had to spend significantly more for brand name medication where there was an FDA-approved generic. The co-pay for brand name medications, the amount Mr. Reisman had to spend, was more for brand-name drugs than for generic drugs.

Answer:  Upon information and belief, Shire admits that Mr. Reisman had an insurance policy through Aetna.  Shire denies the remaining allegations in paragraph 140.

141.   Complaint:   Plaintiff Reisman was an indirect purchaser of AXR. On numerous occasions during the Class Period, Plaintiff Reisman was unable to procure generic AXR due to a lack of generic supply, and had to expend considerably more personal funds to purchase the brand name AXR. Eventually, Mr. Reisman switched to Vyvanse because of his inability to procure generic AXR.

Answer:  Shire denies the allegations in paragraph 141.

## V.   CLASS REPRESENTATION ALLEGATIONS

### A.   Class Definition

142.   Complaint:   Plaintiffs bring this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and (b)(3) on behalf of themselves and on behalf of the Class defined below. The proposed Class consists of the following proposed subclasses:

**All persons residing in the State of Florida who paid elevated prices for AXR products, through co-pays, co-insurance or otherwise since February 15, 2005.**

43

Answer:  The allegations in paragraph 142 set forth a legal conclusion for which no response is required.  To the extent a response is required, Shire denies the allegations in paragraph 142.  Shire further notes that Plaintiffs have subsequently moved the Court to certify a class different from that alleged in paragraph 142.  *See* ECF. No. 217.

143.  Complaint:  Excluded from all of these subclasses are patients covered through governmentally-funded programs (Medicaid and Medicare) and patients with insurance coverage including a flat-rate co-pay provision, and any other consumers who are price insensitive. Also excluded from these subclasses are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries and assigns. Also excluded from the Class are any judge, justice or judicial officer presiding over this matter.

Answer:  The allegations in paragraph 143 set forth a legal conclusion for which no response is required.  To the extent a response is required, Shire denies the allegations in paragraph 143.

144.  Said definition may be further defined or amended by additional pleadings, evidentiary hearings, a class certification hearing, and orders of this Court.

Answer:  The allegations in paragraph 144 set forth a legal conclusion for which no response is required.   To the extent a response is required, Shire denies the allegations in paragraph 144.

**B.**     **Fed. R. Civ. P. 23(a) Factors**

145.  Complaint:  **Numerosity.** The members of the Class are so numerous that separate joinder of each member is impracticable. Plaintiffs do not know the exact number of members in the Class, but based upon information and belief, Plaintiffs reasonably believe that Class Members number at a minimum in the thousands.

44

<u>Answer</u>:  Shire denies the allegations in paragraph 145.

146.   <u>Complaint</u>:  **Commonality.** The claims of Plaintiffs raise questions of law or fact common to the questions of law or fact raised by the claims of each member of the Class. Plaintiffs' claims arise from the same practice or course of conduct that gives rise to the claims of the Class members. The questions of law and fact common to Plaintiffs and the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

a.   Whether Defendants' reverse payment agreements with generic manufacturers constitute the illegal restraint of trade in violation of Section 1 of the Sherman Act and/or Florida Antitrust Act;

b.   Whether Defendants' ████████████ constitute the illegal restraint of trade in violation of Section 1 of the Sherman Act and/or Florida Antitrust Act.

c.   Whether Defendants' violations of Section 1 of the Sherman Act constitute violations of FDUTPA;

d.   Whether Shire's patent infringement lawsuits filed against Teva, Impax and others were filed with the improper purpose of preventing entry of competing generic products into the market, in violation of Section 2 of the Sherman Act and/or Florida's Antitrust Act;

e.   Whether Defendants' reverse payment agreements with generic manufacturers constitute monopolization and/or attempted monopolization in violation of Section 2 of the Sherman Act and/or Florida's Antitrust Act;

f.   Whether Defendants' intentional breach of the supply agreements constitute monopolization and/or attempted monopolization in violation of Section 2 of the Sherman Act and/or Florida's Antitrust Act;

g.   Whether Defendants' ████████████ constitute monopolization and/or attempted monopolization and/or conspiracy to monopolize in violation of Section 2 of the Sherman Act and/or Florida's Antitrust Act;

h.   Whether Defendants' ████████████ constitute unlawful exclusive dealing under the FTC Act, the Sherman Act, and/or the FDUTPA;

45

i.     Whether Defendants' ███████████ constitute an unlawful tying violation under the FTC Act, the Sherman Act, and/or the FDUTPA;

j.     Whether Defendants' ████████████ constitute unlawful predatory pricing under the FTC Act, the Sherman Act, and/or the FDUTPA;

k.     Whether consumers paid supracompetitive prices for AXR products on account of Defendants' █████████████████;

l.     Whether Defendants' violations of Section 2 of the Sherman Act constitute violations of FDUTPA;

m.     Whether Defendants' conduct violated the Florida Antitrust Act;

n.     Whether Defendants' violations of the Florida Antitrust Act constitute violations of FDUTPA;

o.     Whether a relevant market needs to be defined in this case in light of the existence of direct evidence of Defendants' power to exclude generic competition and set supracompetitive prices for AXR Product;

p.     If a relevant market needs to be defined, the definition of the relevant market for analyzing Defendants' monopoly power, and whether Defendants had monopoly power in the relevant market;

q.     Whether, independent of whether Defendants' conduct violated the Sherman Act or Florida's Antitrust Act, Defendants" conduct constitutes unfair and/or fraudulent practices in violation of FDUTPA; and/or

r.     Whether Plaintiffs and the Class have been injured as a result of Defendants' anti-competitive conduct, and the amount of damages.

Answer:  Shire denies the allegations in paragraph 146.

147.   Complaint:  **Typicality.** The claims of Plaintiffs are typical of the claims of each member of the Class. Defendants engaged in a standardized course of conduct affecting the Class Members, and Plaintiffs' alleged injuries arise out of that conduct. All Class Members, including Plaintiffs, have the same or similar injury to their property (i.e. paying higher prices for AXR) as a result of Defendants' anti-competitive conduct.

Answer:  Shire denies the allegations in paragraph 147.

46

148. <u>Complaint</u>: **Adequacy.** Plaintiffs can fairly and adequately protect and represent the interests of each member of the Class. Plaintiffs fit within the class definition and their interests do not conflict with the interest of the members of the Class they seek to represent. Plaintiffs are represented by experienced and able attorneys. The undersigned Class Counsel have litigated numerous class actions and complex cases and intend to prosecute this action vigorously for the benefit of the entire Class. Plaintiffs and Class Counsel can and will fairly and adequately protect the interests of all members of the Class.

<u>Answer</u>: Shire denies the allegations in paragraph 148.

## C.    <u>Fed. R. Civ. P. 23(b)(2) Factors</u>

149. <u>Complaint</u>: Defendants acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and/or corresponding declaratory relief appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, that would establish incompatible standards of conduct for Defendants.

<u>Answer</u>: Shire denies the allegations in paragraph 149.

150. <u>Complaint</u>: Injunctive relief is necessary to prevent further anti-competitive conduct by Defendants. Money damages alone will not afford adequate and complete relief, and injunctive relief is necessary to restrain Defendants from continuing to engage in conduct which restrains, suppresses, and/or eliminates competition in the United States and Florida for the sale of AXR.

<u>Answer</u>: Shire denies the allegations in paragraph 150.

## D.    <u>Fed. R. Civ. P. 23(b)(3) Factors</u>

151. <u>Complaint</u>: **Common issues predominate:** As set forth in detail above, common issues of fact and law predominate because all of Plaintiffs' claims are based on identical anti-competitive conduct.

<u>Answer</u>: Shire denies the allegations in paragraph 151.

152. <u>Complaint</u>: **Superiority:** Additionally, a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each Class Member are such that individual prosecution would prove

burdensome and expensive given the complex and extensive litigation necessitated by Defendants' conduct. It would be virtually impossible for the members of the Class to effectively redress the wrongs done to them on an individual basis. Even if the members of the Class themselves could afford such individual litigation, it would be an unnecessary burden on the courts.

> Answer:  Shire denies the allegations in paragraph 152.

153.   Complaint:  The trial and litigation of Plaintiffs' claims are manageable. Individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system presented by the legal and factual issues raised by Defendants" conduct. By contrast, the class action device will result in substantial benefits to the litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in just one case.

> Answer:  Shire denies the allegations in paragraph 153.

154.   Complaint:  Further, Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief with respect to the Class as a whole appropriate. Moreover, on information and belief, Plaintiffs allege that the conduct complained of herein is substantially likely to continue in the future if an injunction is not entered.

> Answer:  Shire denies the allegations in paragraph 154.

155.   Complaint:  **Notice to the Class:** Notice to the Class may be made by publication.

> Answer:   The allegations in paragraph 155 set forth a legal conclusion for which no response is required.  To the extent a response is required, Shire denies the allegations in paragraph 155.

## VI.   CAUSES OF ACTION

### A.   First Cause of Action: Violations of the Deceptive and Unfair Trade Practices Act, Fla. Stat. 4 501.201, *et seq.* (premised on Section 1 of the Sherman Act)

156.   Complaint:  Plaintiffs repeat and reallege the allegations set forth above, and incorporate the same as if set forth herein at length.

Answer:  With respect to paragraph 156, Shire repeats and incorporates by reference

its answers to all of the foregoing paragraphs 1-155.

157.   Complaint:  Plaintiffs and the Class are "consumers" within the meaning of Fla. Stat. 501.203(7).

Answer:  Shire admits the allegations in paragraph 157.

158.   Complaint:  Defendants' conduct alleged herein relating to the sale of AXR constitutes "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

Answer:  Shire admits the allegations in paragraph 158.

159.   Complaint:   FDUTPA declares "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" to be unlawful. Fla. Stat. § 501.204(1).

Answer:   The allegations in paragraph 159 set forth a legal conclusion for

which no response is required.   To the extent a response is required, Shire denies the

allegations in paragraph 159.

160.   Complaint:  Violations of Section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) constitute unfair, unconscionable, and/or deceptive acts or practices in violation of FDUTPA.

> Answer:  The allegations in paragraph 160 set forth a legal conclusion for which no response is required.  To the extent a response is required, Shire denies the allegations in paragraph 160.

161.    Complaint:  By violating Section 1 of the Sherman Act, 15 U.S.C. § 1, Defendants have violated the Federal Trade Commission Act and engaged in unfair competition and/or unconscionable/unfair acts or practices in violation of FDUTPA.

> Answer:  Shire denies the allegations in paragraph 161.

162.    Complaint:  Further, by violating Section 1 of the Sherman Act, Defendants violated a statute proscribing an unfair method of competition.

> Answer:  Shire denies the allegations in paragraph 162.

163.    Complaint:  Further, by violating Section 1 of the Sherman Act, Defendants have engaged in an unfair practice. Defendants' violations of Section 1 of the Sherman Act offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

> Answer:  Shire denies the allegations in paragraph 163.

164.    Complaint:  Defendants violated Section 1 of the Sherman Act by engaging in the unlawful, anti-competitive conduct set forth herein. Defendants have unreasonably restrained trade and commerce in the relevant product market in violation of Section 1 of the Sherman Act. But for the anti-competitive practices Defendants would not have been able to maintain their monopoly power over the price of AXR in the relevant market.

> Answer:  Shire denies the allegations in paragraph 164.

165.    Complaint:   Defendant [sic] acted in concert with Teva, Impax, and other generic manufacturers in furtherance of the illegal restraint of trade complained of herein.

> Answer:  Shire denies the allegations in paragraph 165.

166.   Complaint:   Defendant's [sic] reverse payment settlements with Teva and Impax constitute *per se* unreasonable restraints of trade. Alternatively, the reverse payment settlements had an unreasonable adverse effect on competition in the properly defined relevant market, and are subject to "quick look" scrutiny. Alternatively, Defendants' reverse payment settlements with Teva and Impax constitute unreasonable restraints of trade under a rule of reason analysis.

Answer:  Shire denies the allegations in paragraph 166.

167.   Complaint:  Shire's agreements with Teva and Impax were comprised of large and unjustifiable payments from Shire to Teva and Impax, who in turn agreed to delay entry into the market. As such, this is an unreasonable restraint of trade. The agreements and various side deals were for no purpose other than delay the generic manufacturers' entry into the drug market and offered no pro-competitive benefits.

Answer:  Shire denies the allegations in paragraph 167.

168.   Complaint:  Defendants acted in concert with █████████ ██████████████████████████ in furtherance of the illegal restraint of trade complained of herein. The provisions of these agreements and attendant use of them by Shire constituted unlawful exclusive dealing, unlawful tying, unlawful predatory pricing, as well as unlawful incentives on consistent supply.

Answer:  Shire denies the allegations in paragraph 168.

169.   Complaint:  Defendants' ████████████ constitute per se unreasonable restraints of trade. Alternatively, the ███████████ had an unreasonable adverse effect on competition in the properly defined relevant market, and are subject to "quick look" scrutiny.

Answer:  Shire denies the allegations in paragraph 169.

170.   Complaint:  Competition, including price competition at the consumer level for AXR (through the emergence of generic alternatives) will continue to be restrained, suppressed or eliminated as a result of Defendants' anti-competitive conduct described herein. The actual adverse effects of these agreements include, but are not limited to:

a.   Shire's control of the AXR and Authorized Generic market;

b.   The delayed entry of generic competition into the AXR market;

51

    c.     A restraint on output of generic AXR; and/or

    d.     Higher prices for brand name AXR (due to shortage of generic competition and ███████████████).

    <u>Answer</u>:  Shire denies the allegations in paragraph 170.

171.   <u>Complaint</u>:  The agreements were further per se anticompetitive for these reasons.

    <u>Answer</u>:  Shire denies the allegations in paragraph 171.

172.   <u>Complaint</u>:  Here, the relevant market is AXR and its generic equivalents sold nationwide.

    <u>Answer</u>:  Shire denies the allegations in paragraph 172.

173.   <u>Complaint</u>:  Competitors, actual and potential, have been, and will continue to be, restrained from vigorously competing with one another for selling AXR as a result of Defendant's [sic] anti-competitive conduct.

    <u>Answer</u>:  Shire denies the allegations in paragraph 173.

174.   <u>Complaint</u>:  Indirect purchasers (including Plaintiffs and members of the putative Class), have been injured in their business and property because they have been deprived of choice, and have paid inflated prices for AXR (or paid higher co-pays for brand name medications), which they otherwise would not have had to pay in the absence of Defendants' anti-competitive conduct. Plaintiffs' and the Class's injuries flow from Defendants' unlawful conduct.

    <u>Answer</u>:  Shire denies the allegations in paragraph 174.

175.   <u>Complaint</u>:  Because of Defendants' violations of Section 1 of the Sherman Act (and hence FDUTPA), consumers (including Plaintiffs and the Class) were deprived of a less expensive generic product, and were forced to purchase a more expensive brand name product. These are the types of injuries the Sherman Act seeks to prevent.

    <u>Answer</u>:  Shire denies the allegations in paragraph 175.

176.   Complaint:   As a direct and proximate result of Defendants' violations of Section 1 of the Sherman Act (and hence FDUTPA), Plaintiffs and the Class have suffered a loss of money and suffered actual damages.

Answer:  Shire denies the allegations in paragraph 176.


177.   Complaint:   There is no federal or state law which affirmatively authorizes Defendants to engage in the conduct alleged throughout this Complaint.

Answer:  Shire denies the allegations in paragraph 177.


178.   Complaint:   In addition to actual damages, Plaintiffs and the Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

Answer:   The allegations in paragraph 178 set forth a legal conclusion for which no response is required.  To the extent a response is required, Shire denies the allegations in paragraph 178.


**B.      Second Cause of Action: Violations of the Deceptive and Unfair Trade Practices Act, Fla. Stat. 4 501.201, _et seq._ (premised on Section 2 of the Sherman Act)**

179.   Complaint:   Plaintiffs repeat and reallege the allegations set forth above, and incorporate the same as if set forth herein at length.

Answer:   With respect to paragraph 179, Shire repeats and incorporates by reference its answers to all of the foregoing paragraphs 1- 178.


180.   Complaint:   By violating Section 2 of the Sherman Act, 15 U.S.C. § 2, Defendants have violated the Federal Trade Commission Act and engaged in unfair competition and/or an unconscionable/unfair act or practice in violation of FDUTPA.

Answer:  Shire denies the allegations in paragraph 180.

181.   <u>Complaint</u>:  Further, by violating Section 2 of the Sherman Act, Defendants violated a statute proscribing an unfair method of competition.

Answer:  Shire denies the allegations in paragraph 181.

182.   <u>Complaint</u>:  Further, by violating Section 2 of the Sherman Act, Defendants have engaged in an unfair practice. Defendants' violations of Section 2 of the Sherman Act offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

Answer:  Shire denies the allegations in paragraph 182.

183.   <u>Complaint</u>:  Defendants violated Section 2 of the Sherman Act. Defendants attempted to and successfully monopolized power over the price of AXR, and over the relevant market--AXR and its generic equivalents nationwide and in the State of Florida. But for Defendants' exclusionary, anti-competitive practices, as set forth at length above, Defendant [sic] would not have been able to maintain its monopoly power over the price of AXR in the relevant market.

Answer:  Shire denies the allegations in paragraph 183.

184.   <u>Complaint</u>:  Defendant [sic] violated Section 2 of the Sherman Act in four ways, and taken together further illustrate a successful attempt to exert an illegal monopoly of the price of ACT and over the relevant market. Defendants (1) engaged in sham patent litigation; (2) entered into reverse payment agreements; (3) entered into ██████████ ██████████; and (4) intentionally breached its supply agreements with Teva and Impax. All of these actions were done to restrict generic AXR output and furthered Defendants' monopolization of the AXR market, excluding generic manufacturers from participating.

Answer:  Shire denies the allegations in paragraph 184.

185.   <u>Complaint</u>:  During the relevant period, Defendants willfully and unlawfully maintained their monopoly power by excluding and impeding competition from the market for AXR. The goal, purpose and/or effect of Defendants' scheme was to prevent, delay, and/or minimize the success of the entry of generic AXR competitors, who would have sold generic versions nationwide and in Florida at prices significantly below Defendants' prices for AXR, and therefore would have taken most of Defendants' market share. Such generic competition would have effectively caused the average market price of AXR to decline dramatically.

       Answer:  Shire denies the allegations in paragraph 185.

186.   Complaint:  Defendants have willfully acquired and/or maintained their monopoly power over the market for the sale of AXR, not through superior skill and/or product, business acumen, or enterprise, but rather through the foregoing anti-competitive and exclusionary conduct. Defendants' conduct in engaging in the sham patent litigation, illegal settlement and ▮▮▮▮▮▮▮▮ and/or intentionally breaching its supply agreements ran afoul of Section 2 of the Sherman Act.

       Answer:  Shire denies the allegations in paragraph 186.

187.   Complaint:  There is no appropriate or legitimate business justification for the actions and conduct which have facilitated Defendants' monopolization of the United States market for the sale of AXR.

       Answer:  Shire denies the allegations in paragraph 187.

188.   Complaint:  Direct purchasers, and indirectly their consumers (including Plaintiffs and members of the putative Class), have been injured in their business and property because they have been deprived of choice, and have paid inflated prices for AXR, which they otherwise would not have had to pay in the absence of Defendants' anti-competitive conduct. Plaintiffs' and the Class's injuries flow from Defendants' unlawful conduct.

       Answer:  Shire denies the allegations in paragraph 188.

189.   Complaint:  Because of Defendants' violations of Section 2 of the Sherman Act (and hence FDUTPA), consumers (including Plaintiffs and the Class) were deprived of a less expensive generic product, and were forced to purchase a more expensive brand name product. These are the types of injuries the Sherman Act seeks to prevent.

       Answer:  Shire denies the allegations in paragraph 189.

190.   Complaint:  As a direct and proximate result of Defendants' violations of Section 2 of the Sherman Act (and hence FDUTPA), Plaintiffs and the Class have suffered a loss of money and suffered actual damages.

       Answer:  Shire denies the allegations in paragraph 190.

191.   Complaint:  In addition to actual damages, Plaintiffs and the Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

Answer:  The allegations in paragraph 191 set forth a legal conclusion for which no response is required.  To the extent a response is required, Shire denies the allegations in paragraph 191.

C.   **Third Cause of Action: Violations of the Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201, _et seq._ (premised on Fla. Antitrust Act)**

192.   Complaint:  Plaintiffs repeat and reallege the allegations set forth above, and incorporate the same as if set forth herein at length.

Answer:  With respect to paragraph 192, Shire repeats and incorporates by reference its answers to all of the foregoing paragraphs 1-191.

193.   Complaint:  By violating the Florida Antitrust Act, Fla Stat. § 542.i 5 et seq. ("FAA"), Defendants have engaged in unfair competition and/or an unconscionable/unfair act or practice in violation of FDUTPA.

Answer:  Shire denies the allegations in paragraph 193.

194.   Complaint:   Further, by violating the Florida Antitrust Act, Defendants violated a statute proscribing an unfair method of competition.

Answer:  Shire denies the allegations in paragraph 194.

195.   Complaint:  Further, by violating the Florida Antitrust Act, Defendants have engaged in an unfair practice. Defendants' violations of the Florida Antitrust Act offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

Answer:  Shire denies the allegations in paragraph 195.

196.   <u>Complaint</u>:  Defendants violated the FAA. The FAA was adopted to foster effective competition and complement the body of federal law (including the Sherman Act) prohibiting restraints of trade or commerce. Under the FAA, every contract, combination, or conspiracy in restraining Florida trade or commerce is unlawful. It is further unlawful to monopolize or attempt to monopolize any part of Florida trade or commerce.

<u>Answer</u>:  Shire denies the allegations in paragraph 196.

197.   <u>Complaint</u>:   Defendants are "persons" within the meaning of Fla. Stat. § 542.17(3).

<u>Answer</u>:  Shire admits the allegations in paragraph 197.

198.   <u>Complaint</u>:   AXR is a "commodity" within the meaning of Fla. Stat. § 542.17(1), and therefore Defendants' business marketing, selling, and/or distributing AXR is "trade or commerce" within the meaning of Fla. Stat. § 542.17(4).

<u>Answer</u>:  Shire admits the allegations in paragraph 198.

199.   <u>Complaint</u>:  The actions described herein, including but not limited to (1) the sham patent litigation, (2) the reverse payment agreements, (3) the ████████████ ███████████ and/or (4) Defendants' intentional breach of its supply agreements with Teva and Impax to capture more market share for itself, constitute illegal restraints of trade, monopolization of trade and/or an attempt or conspiracy to monopolize trade or commerce in Florida and the United States.

<u>Answer</u>:  Shire denies the allegations in paragraph 199.

200.   <u>Complaint</u>:  As a result of the actions described herein, Defendants attempted to acquire a monopoly in Florida and the United States, possessed a monopoly power in Florida and the United States which affected the price of AXR, and acquired that monopoly power in an exclusionary manner.

<u>Answer</u>:  Shire denies the allegations in paragraph 200.

201.   <u>Complaint</u>:  Through the actions described herein, Defendants—throughout the United States including Florida—possessed the ability to affect price and/or output. The reverse payment agreements, ████████████████, and/or Defendants' intentional

57

breach of the supply agreements were intended to and did affect the price or supply of AXR in the market.

      Answer:  Shire denies the allegations in paragraph 201.

      202.   Complaint:  Defendants' wrongful conduct had a substantial anticompetitive effect on commerce within the State of Florida and nationwide.

      Answer:  Shire denies the allegations in paragraph 202.

      203.   Complaint:   The anticompetitive effect of Defendants' actions aside, Defendants' conduct in misallocating the supply of AXR and price-fixing are per se violations of the FAA.

      Answer:  Shire denies the allegations in paragraph 203.

      204.   Complaint:  As a direct and proximate result of Defendants' violations of the Florida Antitrust Act (and hence FDUTPA), Plaintiffs and the Class have suffered a loss of money and suffered actual damages.

      Answer:  Shire denies the allegations in paragraph 204.

      205.   Complaint:  In addition to actual damages, Plaintiffs and the Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

      Answer:  The allegations in paragraph 205 set forth a legal conclusion for which no response is required.  To the extent a response is required, Shire denies the allegations in paragraph 205.

      **D.**     **Fourth Cause of Action: Violations of the Deceptive and Unfair Trade Practices Act, Fla. Stat. 4 501.201, _et seq._ (unfair practices — not premised on violations of Sherman Act or Florida Antitrust Act)**

      206.   Complaint:  Plaintiffs repeat and reallege the allegations set forth above, and incorporate the same as if set forth herein at length.

Answer:  With respect to paragraph 206, Shire repeats and incorporates by reference its answers to all of the foregoing paragraphs 1-205.

207.  Complaint:  Independent of whether Defendants' conduct violated the Sherman Act or Florida Antitrust Act, Defendants' conduct, as described throughout the complaint, are unfair practices in violation of FDUTPA.

Answer:  Shire denies the allegations in paragraph 207.

208.  Complaint:  First, by utilizing sham patent litigation to delay the entry into the market of generic version of AXR, Defendant [sic] engaged in an unfair practice which caused Plaintiffs and the Class to pay more for AXR than they would have but for this wrongful conduct.

Answer:  Shire denies the allegations in paragraph 208.

209.  Complaint:  Second, by contriving with the generic manufacturers to enter into reverse payment agreements, Defendants delay the entry into the market of generic version of AXR, and thus engaged in an unfair practice which caused Plaintiffs and the Class to pay more for AXR than they would have but for this wrongful conduct.

Answer:  Shire denies the allegations in paragraph 209.

210.  Complaint:  Third, by entering into monopolistic, collusive, and conspiratorial ███████████████████, Defendants endeavored to retain market share and ███████████████████████████████████████████████████████████████████████ ██████████████████████

Answer:  Shire denies the allegations in paragraph 210.

211.  Complaint:  Fourth, by intentionally breaching the supply agreements with the generic manufacturers, Defendants further artificially controlled the supply and cost of AXR, causing Plaintiffs and the Class to pay more for AXR than they would have but for this wrongful conduct.

Answer:  Shire denies the allegations in paragraph 211.

212.   Complaint:   Defendants' unfair practices, as described here, offend established public policy, and are immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers. Defendants forced users of its prescription medication, who had no reasonable alternatives, to pay higher prices well into the period in which generic alternatives to AXR should have been available. Defendants were motivated solely by profit at the expense of Plaintiffs and the Class.

Answer:   Shire denies the allegations in paragraph 212.

213.   Complaint:   As a direct and proximate result of Defendants' unfair practices (which violate FDUTPA), Plaintiffs and the Class have suffered a loss of money and suffered actual damages.

Answer:   Shire denies the allegations in paragraph 213.

214.   Complaint:   In addition to actual damages, Plaintiffs and the Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. §§ 501.2105 and 501.211.

Answer:   The allegations in paragraph 214 set forth a legal conclusion for which no response is required.  To the extent a response is required, Shire denies the allegations in paragraph 214.

### E.   Fifth Cause of Action: Violations of the Deceptive and Unfair Trade Practices Act, Fla. Stat. el 501.201, *et seq.* (deceptive acts — not premised on violations of Sherman Act or Florida Antitrust Act)

215.   Complaint:   Plaintiffs repeat and reallege the allegations set forth above, and incorporate the same as if set forth herein at length.

Answer:   With respect to paragraph 215, Shire repeats and incorporates by reference its answers to all of the foregoing paragraphs 1-214.

216.   Complaint:   Independent of whether Defendants' conduct violated the Sherman Act or Florida Antitrust Act, Defendants' conduct, as described throughout the complaint, are deceptive acts in violation of FDUTPA.

60

     Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' Fifth Cause of Action for failure to state a claim.  Therefore, the allegations in paragraph 216 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 216.

     217.   Complaint:  Plaintiffs bring this count on their own behalf and on behalf of all Class members.

     Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' Fifth Cause of Action for failure to state a claim.  Therefore, the allegations in paragraph 217 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 217.

     218.   Complaint:  Defendants sale of pharmaceuticals constitutes trade or commerce" under FDUPTA.

     Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' Fifth Cause of Action for failure to state a claim.  Therefore, the allegations in paragraph 218 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 218.

     219.   Complaint:  Plaintiffs and Class members are "consumers" under Fla. Stat. § 501.203 who purchased AXR for personal use, and not for resale.

     Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' Fifth Cause of Action for failure to state a claim.  Therefore, the allegations in paragraph 219 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 219.

220.   <u>Complaint</u>:  Each Defendant is a "person" or "entity" as used in the FDUPTA.

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' Fifth Cause of Action for failure to state a claim.  Therefore, the allegations in paragraph 220 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 220.

221.   <u>Complaint</u>:   Defendants engaged in deceptive conduct in violation of the Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, <i>et seq.</i> when they (1) initiated baseless sham patent litigation, (2) entered into ███████████████, and/or (3) entered into supply agreements with the hidden intent to breach said agreements with the generic manufacturers, Teva and Impax, in order to artificially control the supply and cost of AXR in the marketplace. Defendants' sham patent litigation and intentional breach of the agreements with Teva and Impax restricted generic AXR output and furthered Defendants' monopolization of the AXR market.

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' Fifth Cause of Action for failure to state a claim.  Therefore, the allegations in paragraph 221 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 221.

222.   <u>Complaint</u>:  Defendants further engaged in deceptive conduct when they falsely and publically claimed that they breached the supply agreements with Teva and Impax because the DEA failed to set a manufacturing quota high enough to meet demand.

Answer:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' Fifth Cause of Action for failure to state a claim.  Therefore, the allegations in paragraph 222 do not require a response.  To the extent a response is required, Shire denies the allegations in paragraph 222.

223.   Complaint:   The goal, purpose and/or effect of Defendants' deceptive scheme was to prevent, delay, and/or minimize the success of the entry of generic AXR competitors, who would have sold generic versions nationwide and in Florida at prices significantly below Defendants' prices for AXR.

   Answer:   The Court's September 4, 2015 Order Granting In Part Shire's

Motion to Dismiss dismissed Plaintiffs' Fifth Cause of Action for failure to state a

claim.   Therefore, the allegations in paragraph 223 do not require a response.   To the

extent a response is required, Shire denies the allegations in paragraph 223.

224.   Complaint:   As a direct and proximate result of Defendants' deceptive conduct, Plaintiffs and Class members were deprived of the opportunity to purchase a generic version of AXR, from July 1, 2009 to the present.

   Answer:   The Court's September 4, 2015 Order Granting In Part Shire's

Motion to Dismiss dismissed Plaintiffs' Fifth Cause of Action for failure to state a

claim.   Therefore, the allegations in paragraph 224 do not require a response.   To the

extent a response is required, Shire denies the allegations in paragraph 224.

225.   Complaint:   Plaintiffs and members of the Class have been injured in their business and property by reason of Defendants' anticompetitive and deceptive acts alleged in this Count. The injury consists of paying higher prices for AXR prescription drugs than they would have paid in the absence of these violations. This injury is of the type Fla. Stat. § 501.201, *et seq.* was designed to prevent and directly results from Defendants' unlawful conduct.

   Answer:   The Court's September 4, 2015 Order Granting In Part Shire's

Motion to Dismiss dismissed Plaintiffs' Fifth Cause of Action for failure to state a

claim.   Therefore, the allegations in paragraph 225 do not require a response.   To the

extent a response is required, Shire denies the allegations in paragraph 225.

226.   <u>Complaint</u>:   In addition to actual damages, Plaintiffs and the Class are entitled to declaratory and injunctive relief as well as reasonable attorney's fees and costs pursuant to Fla. Stat. § 501.201, *et seq.*

<u>Answer</u>:   The Court's September 4, 2015 Order Granting In Part Shire's Motion to Dismiss dismissed Plaintiffs' Fifth Cause of Action for failure to state a claim.   Therefore, the allegations in paragraph 226 do not require a response.   To the extent a response is required, Shire denies the allegations in paragraph 226.

## Affirmative Defenses

1.  Plaintiffs' claims are barred by the FDUTPA's four year statute of limitations.

2.  Plaintiffs' claims are barred by the doctrine of laches.

3.  Plaintiffs' claims are barred by the legal doctrine developed through *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), which renders antitrust and consumer protection laws inapplicable to individual or group action intended to influence legislative, executive, administrative, or judicial decision-making.

4.  Each count of Plaintiffs' complaint fails to state a claim upon which relief may be granted.

5.  Plaintiffs have suffered no recoverable loss or injury as a result of Shire's alleged illegal conduct.

64

6. By altering their theory of the case in their Renewed Motion for Class Certification, ECF No. 217, Plaintiffs have waived the allegations that do not pertain to their modified theory.

Dated:  September 24, 2015

Respectfully submitted,

/s/ Daniel J. Barsky
Eric. C. Christu (FL Bar No. 434647)
   echristu@shutts.com
Daniel J. Barsky (FL Bar No. 25713)
   dbarsky@shutts.com
SHUTTS & BOWEN LLP
525 Okeechobee Boulevard, Suite 1100
West Palm Beach, FL 33401
561-650-8556(ph)/561-671-5900(fax)

   /s/ Michael F. Brockmeyer
Porter F. Fleming*
   pfleming@flhlaw.com
Michael F. Brockmeyer*
   mbrockmeyer@flhlaw.com
David A. Zwally*
   dzwally@flhlaw.com
John Collins*
   jcollins@flhlaw.com
Edgar H. Haug*
   ehaug@flhlaw.com
David S. Shotlander*
   dshotlander@flhlaw.com
FROMMER LAWRENCE & HAUG LLP
745 Fifth Avenue
New York, NY 10151
212-588-0800(ph)/212-588-0500(fax)
***Counsel for Shire Defendants***
***\*Admitted Pro Hac Vice***

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that a true and correct copy of the foregoing was served upon counsel of record this the 28th day of September, 2015 via CM/ECF electronic noticing:

**Brian Tse-Hua Ku, Esq.**
Ku & Mussman PA
12550 Biscayne Boulevard
Suite 406
Miami, FL 33181
305-891-1322(ph)/305-891-4512(fax)
brian@kumussman.com

**M. Ryan Casey, Esq.**
Ku & Mussman PA
12550 Biscayne Boulevard
Suite 406
Miami, FL 33181
305-891-1322(ph)/305-891-4512(fax)
ryan@kumussman.com

**Alan Kanner, Esq.**
**Conlee Whiteley, Esq.**
**John R. Davis, Esq.**
Kanner & Whiteley, LLC
701 Camp Street
New Orleans, LA 70130
504-524-5777(ph)/504-524-5763(fax)
a.kanner@kanner-law.com
c.whiteley@kanner-law.com
j.davis@kanner-law.com

**Richard M. Golomb, Esq.**
**Ruben Honik, Esq.**
**Kenneth J. Grunfeld, Esq.**
GOLOMB & HONIK, PC
1515 Market Street, Suite 1100
Philadelphia, PA 19102
(215) 985-9177
rgolomb@golombhonik.com
rhonik@golombhonik.com
kgrunfeld@golombhonik.com

/s/ Daniel J. Barsky_____
Daniel J. Barsky