**COMPOSITE
EXHIBIT "1"**

# EXHIBIT A

Selected excerpts from the August 25, 2015 Deposition of Robert P. Navarro, Pharm.D. in this action.

[Page 1]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI—DADE DIVISION

CASE NO. 13—21158—CIV—LENARD/O'SULLIVAN

------------------------------------------

MONICA BARBA and JONATHAN REISMAN, on

behalf of themselves and all others

similarly situated,

       Plaintiffs,

   vs.

SHIRE U.S., INC., a New Jersey

Corporation, SHIRE, LLC, a Kentucky

Limited Liability Company, and

DOES 1 through 100, inclusive,

       Defendants.

------------------------------------------

VIDEOTAPED DEPOSITION OF

DR. ROBERT P. NAVARRO, Pharm. D.

Tuesday, August 25, 2015

10:00 a.m.

Reported by:

Joan Ferrara

                                                    [Page 56]

 1          Dr. R.P. Navarro, Pharm. D.

 2      A.    Yes, sir.

 3      Q.    You would typically expect a

 4  pharmacy purchasing record to identify the

 5  member cost share paid for the drug,

 6  correct?

 7      A.    Member cost share paid may be a

 8  field that's included in a prescription

 9  record, yes.

10      Q.    You would typically expect a

11  pharmacy purchasing record to show the

12  total prescription cost, correct?

13      A.    I have seen total prescription

14  costs produced in pharmacy records, yes,

15  sir.

16      Q.    The question was you would

17  typically expect the pharmacy purchasing

18  record to show the total prescription cost

19  per your language in paragraph 23?

20      A.    Yes, there is typically a basis

21  of a total prescription cost, a dollar

22  amount of the total prescription cost, yes,

23  sir.

24      Q.    And you also have, in paragraph

25  23, the term "prescription number."

Dr. R.P. Navarro, Pharm. D.

2        What is that?

3   A.   Pharmacists assign a prescription

4 number to every prescription, every new

5 prescription.

6   Q.   So that's a unique number for

7 every prescription dispensed by a pharmacy?

8   A.   It's a unique number for every

9 new prescription, such as refills may occur

10 on the same prescription number.

11   Q.   You would typically expect a

12 pharmacy purchasing record to identify a

13 prescription number, correct?

14   A.   Yes, sir.

15   Q.   And would you typically expect a

16 pharmacy purchasing record to identify the

17 pharmacy at which the patient filled the

18 prescription?

19   A.   Yes, my experience is that there

20 is a pharmacy identifier that's typically

21 on the prescription records.

22   Q.   We've been talking now about when

23 a patient fills a prescription at a brick

24 and mortar pharmacy, correct?

25   A.   Yes, sir.

[Page 58]

1       Dr. R.P. Navarro, Pharm. D.

2       Q.    How, if at all, would the

3   purchasing process vary, if at all, in the

4   case of mail order pharmacies?

5       A.    The legal requirements would be

6   the same, that is the information required.

7   There may be an electronic transmission of

8   the prescription from the physician to the

9   mail service pharmacy.  A patient often has

10  to mail in the paper prescription to the

11  mail service pharmacy.

12          So the information obtained is

13  very similar.  The records produced may be

14  very similar as well.

15      Q.    You would expect a mail order

16  pharmacy purchase record to have typically

17  identified the same types of information

18  that we went through a little earlier,

19  correct?

20      A.    In general, I would expect mail

21  service pharmacy to produce similar

22  information on a prescription record.

23      Q.    Sir, you reference in paragraph

24  32 of your declaration that Florida law

25  required retention of pharmacy records at

[Page 59]

```
 1        Dr. R.P. Navarro, Pharm. D.

 2   pharmacies at two or four years depending

 3   on time period, is that right?

 4        A.    Yes, sir.

 5        Q.    Do you agree with Dr. Rubinstein

 6   that an entity that participates in

 7   Medicare must maintain records for at least

 8   10 years?

 9        A.    My understanding is that entities

10   participating in Medicare are expected to

11   maintain records for 10 years.

12        Q.    And is it your understanding that

13   entities participating in Medicare also

14   require the contracting pharmacies to

15   maintain records for 10 years as well?

16        A.    My understanding is that entities

17   participating in Medicare are required to

18   maintain prescription records for 10 years.

19        Q.    That would include insurers?

20        A.    It would include insurers, as in

21   health plans, yes, sir.

22        Q.    Would that include PBMs?

23        A.    Yes, sir.

24        Q.    Would that include pharmacies?

25        A.    My belief is yes, sir.
```

                Dr. R.P. Navarro, Pharm. D.

1

2    request their own pharmacy purchase

3    records?

4        A.    It's my opinion that a patient

5    has the right to request their prescription

6    records.

7        Q.    Is it your opinion that a patient

8    has a right to request their personal

9    health information?

10            MR. ZWALLY:  Objection.

11       A.    Absent any legal conclusion based

12   upon HIPAA, I would say that depending upon

13   the patient situation, a patient may have

14   the right to request their medical records.

15       Q.    Do you agree that consumers have

16   a right to obtain their prescription

17   purchase records from PBMs, to the extent

18   the information exists?

19       A.    From a non-legal perspective, I

20   believe that patients have the right to

21   request past prescription information from

22   their PBM.

23       Q.    Same question for health plans,

24   do you agree that consumers have a right to

25   obtain their prescription purchase records

```
 1        Dr. R.P. Navarro, Pharm. D.

 2    from health plans to the extent the

 3    information exists?

 4        A.    I believe patients have the right

 5    to request their prescription records from

 6    health plans.

 7        Q.    Do you agree that consumers have

 8    a right to obtain their own pharmacy

 9    purchase records at no cost or the cost of

10    copying?

11        A.    I don't know if patients have the

12    right to obtain those records at no cost.

13        Q.    Are you aware that patients can

14    obtain pharmacy records at no cost or at

15    the cost of copying?

16             MR. ZWALLY:  Objection.  Asked

17        and answered.

18        A.    My understanding is that the

19    availability and cost to obtain patient

20    records varies by the pharmacy or pharmacy

21    corporation or the PBM or the healthcare

22    plan.

23        Q.    Are you aware of any federal

24    law -- strike that.

25             Are you aware of any Florida law
```

[Page 99]

1          Dr. R.P. Navarro, Pharm. D.

2       A F T E R N O O N    S E S S I O N

3               (Time noted:  1:05 p.m.)

4

5               THE VIDEOGRAPHER:  The time is

6       1:06 p.m., and this begins media

7       number 3.

8    BY MR. STANOCH:

9       Q.    Welcome back, Doctor.

10      A.    Good afternoon.

11      Q.    Good afternoon to you as well.

12            When a patient purchases Adderall

13   XR in the pharmacy, the transaction record

14   is created at the pharmacy, correct?

15      A.    When a patient purchases a

16   prescription for Adderall, the pharmacy

17   does maintain a prescription record, yes,

18   sir.

19      Q.    And when a patient purchases a

20   prescription for Adderall XR, if insured,

21   the patient agency health plan would have a

22   transaction record as well, typically,

23   correct?

24            MR. ZWALLY:  Objection.

25      A.    The health plan may have a record

[Page 100]

1          Dr. R.P. Navarro, Pharm. D.

2     <mark>of the prescription transaction.</mark>

3          Q.    And you reviewed some of the

4     plaintiff's records in this case, correct?

5          A.    The records and documents I

6     reviewed are listed in my document list.

7          Q.    And you listed some plaintiff

8     Bates numbered documents, and pull them up,

9     but do you recall some of those were

10    documents from plaintiff's health insurer

11    Aetna?

12         A.    I do recall, I believe, a

13    document from Aetna.

14         Q.    And that's just an example of a

15    record that a health plan may create for a

16    patient's purchase of Adderall XR?

17         A.    Possibly.  However, I would have

18    to look at the specific record to know if

19    that's the case or not.

20         Q.    And when a patient purchases

21    Adderall XR in a pharmacy, if the pharmacy

22    benefits is managed by a PBM, the PBM would

23    have a transaction record as well, is that

24    right?

25         A.    If a pharmacy benefit is managed

[Page 101]

1        Dr. R.P. Navarro, Pharm. D.

2    by a PBM and one of the services that a PBM

3    is providing is the pharmacy network and

4    claims adjudication services, the PBM would

5    have a record of that transaction, yes,

6    sir.

7        Q.    And none of those three sources,

8    the pharmacy, a PBM, or a health plan,

9    would apply in the case of a consumer

10   purchase of a stick of gum, a pack of gum

11   at a pharmacy, is that right?

12       A.    If a patient purchased a

13   nonpharmaceutical item that was not covered

14   by a health or medical -- a medical or

15   pharmacy benefit program, I would not

16   expect there to be a record at the plan.

17       Q.    The PBM, what record, if any,

18   would you expect would even exist in the

19   case of a patient who purchased a consumer

20   item like a pack of gum or cornstarch or

21   something like that?

22       A.    Well, my recollection, having

23   purchased items at pharmacies, is that as a

24   patient, I'm provided a receipt that may or

25   may not be itemized.

[Page 136]

          Dr. R.P. Navarro, Pharm. D.

 1       data.

 2       A.    Yes, sir.

 3

 4       Q.    We discussed earlier that PBMs

 5  maintain patient pharmacy transaction

 6  records to some extent.

 7            Is it your assertion that

 8  information available at a PBM would be --

 9  well, strike that.

10            You say in paragraph 38 that you

11  think there will be similar issues

12  obtaining data from a PBM as there would be

13  a pharmacy, right?

14       A.    The beginning of paragraph 38, if

15  that's the sentence, my opinion obtaining

16  patient-level prescription drug from a PBM

17  similar issues -- yes, sir.

18       Q.    And then you lay out first,

19  second, third, what you think those issues

20  are, right?

21       A.    Yes, sir.

22       Q.    Would you expect a PBM to have

23  the same type of pharmacy transaction

24  record data as a dispensing pharmacy?

25       A.    As I say in my report, I believe

[Page 137]

1        Dr. R.P. Navarro, Pharm. D.

2   the prescription record that is a

3   prescription history is similar to what a

4   pharmacy maintains, that is those data from

5   a PBM prescription record.

6        Q.    So if a potential class member or

7   members' pharmacy were to fill a

8   prescription for Adderall XR, would he even

9   need to request that same duplicative

10  information from a PBM?

11       A.    The PBM is an alternative source

12  of some of the prescription history

13  information.

14            If information was obtained from

15  a dispensing pharmacy, it may not be

16  necessary assuming it's complete, may not

17  be necessary to obtain information from a

18  PBM if the information obtained from the

19  pharmacy is complete and satisfies the

20  requirement.

21       Q.    And now vice versa.  Assuming a

22  class member recalls his PBM during the

23  class period, would he need to recall the

24  pharmacy at which he filled Adderall XR

25  during the class period to request

[Page 187]

```
 1        Dr. R.P. Navarro, Pharm. D.

 2    program and benefit design.

 3        Q.    Thank you.

 4             So your point here is that even

 5    though everyone might use the NCPDP data

 6    standards, the specific data elements that

 7    a given entity might use might vary, is

 8    that fair?

 9        A.    By pharmacy program and benefit

10    design, yes, sir.

11        Q.    Do you agree that there is a set

12    of core elements of NCPDP data standards

13    that would be required for every pharmacy

14    program and benefit transaction for the

15    transaction to take place?

16             MR. ZWALLY:  Objection.

17        A.    There are certain NCPDP data

18    elements used routinely to process

19    prescriptions based upon the information

20    required by State Board of Pharmacy

21    regulations.

22        Q.    What would those be?

23        A.    I mentioned some of them earlier

24    in my report, that is the identification of

25    the patient, if there is a third-party
```

[Page 188]

1        Dr. R.P. Navarro, Pharm. D.

2    involved with pain and prescription, such

3    as a health plan or PBM, the subscriber

4    information so that the prescription can be

5    routed and adjudicated properly as far as

6    specific benefit design, the drug

7    information as well, and the cost

8    information is also based upon the specific

9    pharmacy benefit design purchased by the

10   employer group, for example, on behalf of a

11   member of that particular plan.

12              So those are some of the elements

13   that are required to process a managed

14   prescription drug claim accurately.

15   Q.    Thank you.

16              And Exhibit 10 is the prime

17   therapeutics payer specification sheet.  I

18   believe it was produced by plaintiffs with

19   Dr. Rubinstein's declaration, and I think

20   you've reviewed it as part of your work in

21   this case.

22   A.    Yes, sir.

23   Q.    And so we're clear, what is a

24   payer specification sheet?

25   A.    Based upon NCPDP data element

# EXHIBIT B

Selected excerpts from the July 28, 2015 Deposition of Elan Rubinstein, Pharm.D. in this action.

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA (MIAMI)


MONICA BARBA and JONATHAN        )
REISMAN, on behalf of            )
themselves and all               )
others similarly situated,       )
                                 )  Case No.
                                 )  1:13-cv-21158-JAL
            Plaintiffs,          )
                                 )
v.                               )
                                 )
SHIRE U.S., INC., a New Jersey   )
Corporation, SHIRE, LLC, a       )
Kentucky Limited Liability       )
Company, and DOES 1 through      )
100, inclusive,                  )
                                 )
            Defendants.          )
_____  )


VIDEOTAPED DEPOSITION OF ELAN RUBINSTEIN

Santa Monica, California

Tuesday, July 28, 2015

9:03 a.m.




REPORTED BY:
GRACE CHUNG, CSR No. 6426, RMR, CRR, CLR
JOB NO:  40006

77

1   according to this Express Scripts' authorization form,

2   is available back to 2006.

3        Q.   And in your professional experience,

4   Dr. Rubinstein, is that a standard availability across

5   the entire waterfront of prescription use?

6        MR. ZWALLY:  Objection.

7        A.   You said "this."'  Ten years is the

8   standard.

9   BY MR. HONIK:

10       Q.   Okay.  You used the term, a couple of times

11   to my hearing, that there is an amazing amount of data

12   that would reveal the kinds of information about what

13   you testified.

14            Why do you say there is an amazing amount

15   of data?

16       MR. ZWALLY:  Objection.

17       A.   It's an amazing amount of data, because

18   every single piece of information that you could want

19   to understand how a person uses a prescription drug is

20   housed within the database.  And it doesn't work like

21   that in the medical claims world.  There's far less

22   detail, far, far less detail, available, including for

23   the fact that a patient has an electronic -- a medical

24   record which is usually in the physician's office, not

25   in a medical claims database that the insurance

78

1    company has access to.  With prescription drugs,

2    you've got an amazing amount of data to analyze.

3            I think maybe I stop there.

4    BY MR. HORNIK:

5        Q.   Dr. Rubinstein, the data about which you

6    speak, is it available, for the ten-year period that

7    I've told us about, in an electronic form?

8            MR. ZWALLY:  Objection.

9        A.   Yes, it is available in an electronic form.

10    BY MR. HONIK:

11        Q.   And what's the significance of its

12    availability in an electronic form to one's ability to

13    extract information from it?

14            MR. ZWALLY:  Objection.

15        A.   The availability of the data in electronic

16    forms means that it can be analyzed very, very easily

17    and very efficiently, very cleanly.  An algorithm can

18    be written to identify the patients who receive

19    Adderall XR branded or any other product or any other

20    combination of products.  It can be done very

21    efficiently, very quickly, frankly, not very

22    expensively, and extremely accurately.

23    BY MR. HORNIK:

24        Q.   And among the data that one could extract

25    or manipulate in the way -- or analyze in the way

86

STATE OF CALIFORNIA   )
                      )   ss.
COUNTY OF LOS ANGELES )

        I, GRACE CHUNG, RMR, CRR, CSR No. 6246, a

Certified Shorthand Reporter in and for the County of

Los Angeles, the State of California, do hereby

certify:

        That, prior to being examined, the witness

named in the foregoing deposition was by me duly sworn

to testify the truth, the whole truth, and nothing but

the truth;

        That said deposition was taken down by me

in shorthand at the time and place therein named, and

thereafter reduced to typewriting by computer-aided

transcription under my direction.

        Before completion of the deposition, review

of the transcript was requested; any changes made by

the deponent (and provided to the reporter) during the

period allowed are appended hereto.

        I further certify that I am not interested

in the event of the action.

        In witness whereof, I have hereunto

subscribed my name.

                Dated: July 30th 2015


                            GRACE CHUNG, CSR NO. 6246

# EXHIBIT C

Selected pages from the Declaration of Robert P. Navarro, Pharm.D., dated August 7, 2015.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Miami-Dade Division

### CASE NO. 13-21158-CIV-Lenard/Goodman

-------------------------------------------------------------

MONICA BARBA and JONATHAN
REISMAN, on behalf of themselves and all
others similarly situated,

       Plaintiffs,

       v.

SHIRE U.S., INC., a New Jersey Corporation,
SHIRE, LLC, a Kentucky Limited Liability
Company, and DOES 1-100, inclusive,

       Defendants.

-------------------------------------------------------------

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## DECLARATION OF ROBERT P. NAVARRO, PHARM.D.
## IN SUPPORT OF DEFENDANTS' OPPOSITION TO
## <u>PLAINITFFS' RENEWED MOTION FOR CLASS CERTIFICATION</u>

01577256.DOCX

22.     Pharmacists dispensing a prescription use a point-of-service (POS) computerized pharmacy management software system (one of the many available or a proprietary system) that includes the screens required to adjudicate cash prescriptions or prescriptions covered by a patient's insurance program.  The POS system communicates with a PBM or another claims processing entity that provides patient-specific prescription drug benefit coverage information based upon the plan benefit design purchased by the sponsoring entity (e.g., an employer group). A pharmacist (or pharmacy technician) inputs the required patient and prescription information (e.g., group, bin, patient ID and/or name, insurer, and other requested data) as well as the standard prescription information (e.g., drug NDC, quantity dispensed, days supply, strength, and other information, date, other drug identifiers), and other information required by the state Board of Pharmacy, and other benefit specific data required, such as ==prescriber information (e.g., prescriber identifier, if use of a defined physician provider panel is required),== prescription cost information (usually auto-populated by the pharmacy POS system) and other requested data. Upon entering the required data, the POS screen refills with adjudication information provided to the pharmacy from the claims processor based upon the patient specific benefit, including information regarding whether the patient, prescriber (if required), and drug are eligible for reimbursement, whether there are required changes (e.g., drug not covered, change to an alternative; generic only is covered; other pertinent messages), and the patient dollar amount to be collected.

23.     For individual patients, the pharmacy purchase record will typically identify the drug dispensed, date dispensed, member cost share paid, prescription cost, and prescription number.  But pharmacy-level data will not describe the type of prescription drug benefit (e.g., "flat co-payment" plans, which are excluded from the Class).  Nor will the information provided

37.     In his declaration, Dr. Rubinstein states that pharmacies and PBMs maintain patient-level prescription drug claims data.[28] But he admitted in his deposition that the prescription history data that a potential class member would get from a PBM is largely duplicative of what that person would get from a pharmacy.[29] I agree with Dr. Rubinstein that the level of data available from a PBM by a patient request will be prescription level data, similar to data available from a dispensing pharmacy.

38.     Additionally, in my opinion, obtaining patient-level prescription drug claims data from a PBM presents similar issues to obtaining data from a pharmacy.  First, the data will not provide enough information to confirm class membership (e.g., cannot confirm patients with a flat copay plan).  Second, the data will be difficult to obtain.  Third, if obtained, the data will be difficult to aggregate, synthesize, and review.

39.     First, to my knowledge, there are roughly 100 PBMs that operate in the U.S.[30] I do not expect this to have been significantly different during the Class Period.  Dr. Rubinstein made a similar estimate at his deposition.[31] It is my experience that few people can identify their PBM today, and fewer will know who their PBM was during the Class Period.  In fact, Dr. Rubinstein testified that he did not know who his PBM was in 2007 and did not know who his current PBM was.[32] He further testified that in 2007 most people did not know who their PBM

---

[28] Rubinstein Decl. at ¶ 33.

[29] Rubinstein Dep. at 61:24-62:3.

[30] Improving Health Care:  A Dose of Competition, A Report by the Federal Trade Commission and the Department of Justice, dated July 2004 (estimating 60 PBMs in 2004); The US Pharmacy Benefit Management (PBM) Industry Report: 2013 Edition – New Report by Koncept Analytics (estimating 100 PBMs in 2013), available at http://www.slideshare.net/prkonceptanalytics/the-us-pbm-industry-report-2013, access July 31, 2015.

[31] Rubinstein Dep. at 23:4-10.

[32] Rubinstein Dep. at 24:4-9.

01577256.DOCX

Adderall XR 30 mg (30 units) ranged from $168.99 at a Gainesville, FL Target to $299.00 at a Jacksonville, FL CVS.  Cash prices for the generic alternative drug ranged from $52.49 at the Gainesville, FL, Target to $221.37 at Wise's Pharmacy, in Gainesville, FL.

**VII.    CONCLUSIONS**

48.     In sum, Dr. Rubinstein did not provide a method for confirming class membership.  In particular, Dr. Rubinstein failed to account for the exclusions of class membership in his declaration.  The pharmacy purchase records and patient-level prescription drug claims detail that Dr. Rubinstein discussed will not provide information regarding insurance benefit type (e.g., flat co-pay), which is necessary to determine whether a potential class member is, in fact, in the class.  Additionally, obtaining and analyzing the records that Dr. Rubinstein proposes (and did not actually obtain) would require significant individualized effort.

49.     Regarding pharmacy pricing for uninsured cash payers in several Florida counties, my research indicates that the price for Adderall XR differs from pharmacy to pharmacy and the price for generic equivalents of Adderall XR differs from pharmacy to pharmacy.

Executed:  August 7, 2015

Robert P. Navarro, Pharm.D.

# EXHIBIT D

Selected pages from the Declaration of Elan Rubinstein, Pharm.D., dated June 17, 2015.

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF FLORIDA**

**Miami-Dade Division**

Case No. 13-21158-Civ-Lenard/Goodman

MONICA BARBA and JONATHAN
REISMAN, on behalf of themselves and all
others similarly situated,

                    Plaintiffs,

v.

SHIRE U.S., *et al.*,

                    Defendants.

**DECLARATION OF ELAN RUBINSTEIN, PHARM.D., MPH**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

## VII.   Data Exists To Confirm Class Members' Purchases of Adderall XR or Generic Equivalents During The Class Period

18.   Whether employer-insured, self-insured, or uninsured, United States consumers prescribed drugs all have at least one point of interface (besides with prescribing healthcare providers) that creates a recorded transaction of the drug purchased, in what quantities, when, where, and how much was paid.   This substantially is an outgrowth of state and federal regulatory schemes for prescription drugs.

19.   At the pharmacy counter or other point of sale, beneficiaries with health insurance that includes prescription benefit coverage will typically pay a cost-share to the pharmacy for the prescription drug. The cost-sharing type (e.g., copayment or coinsurance) and amount are set by the terms of that health plan member's benefit design. If the pharmacy plan is administered by a PBM, the PBM then bills the member's health plan or other payer an amount based on the payment formula stipulated in its provider service agreement, minus the beneficiary cost-share amount collected by the pharmacy.   Individuals without health insurance or other coverage for the purchase of their prescription drugs or without the assistance of negotiated pricing through a "discount card" program must pay the pharmacy's or other provider's "usual and customary" (U&C) price to obtain their drugs.

20.   Because of the nature of these pharmacy transactions, all United States prescription drug pharmacy claims management software modules and computer systems that serve pharmacies, pharmacy benefit management companies, and health plans; facilitate ePrescribing by physicians; and serve third party payer types including commercial, Medicare, Medicaid, Department of Veterans Affairs and Department of Defense; rely on claims system data elements and related data description standards that are maintained by the National Council for Prescription Drug Programs (NCPDP).

21.   NCPDP data elements are as follows based on NCPDP data standards.  A version of these standards, published in 1999, remains substantially unchanged or with backward compatibility to the present.   These data elements include:   Cardholder first name, Cardholder last name, Cardholder insurance ID, Patient first name, Patient last name, Patient ID number, Enrollment relationship code (relationship of family member to the cardholder), Patient address (several address fields), Product description (product assigned NDC – National Drug Code – which defines product labeler, drug generic ingredient, dosage form, strength and bottle size), Product generic name, Product strength, Metric quantity medication dispensed, Date of service (date prescription dispensed), Gross amount due (ingredient cost, dispensing fee, sales tax, incentive, other, as applicable – individual allowed amounts shown in separate data fields in addition to this summary field), Patient pay amount (patient total cost share, including copayment and amount applied to deductible, over maximum amounts, penalties, etc), Plan reimbursement amount (amount plan reimburses the pharmacy), Pharmacy type (e.g., retail pharmacy, long term care pharmacy),

Declaration of Elan Rubinstein, Pharm.D., MPH
*Barba, et al. v. Shire U.S., et al.*, Case No. 13-21158-Civ-Lenard/Goodman (S.D. Fla.)

Page -3-

Pharmacy name, Pharmacy address (several address fields), Plan name (health plan or third party payer sponsoring the pharmacy benefit).[3]

22.    When a consumer requests a copy of his or her pharmacy records, appropriate claims-based data, utilizing data fields defined by the NCPDP data standards, is extracted to generate the requested report.

23.    In addition, U.S. prescription drug data vendors – FirstDatabank, MediSpan, Gold Standard and Red Book – maintain drug wholesale acquisition cost or direct price, as provided by labelers, for drugs identified by the unique NDC.[4]  Users of prescription drug data, including pharmacies, PBMs and health plans, rely on data provided by one of these vendors in the normal course of business, including for calculation of product price based on formulas stipulated in PBM customer service agreements for insured patients, or based on formulas maintained by pharmacies for cash-pay patients.[5]

24.    A typical relationship between a Pharmacy Benefit Manager (PBM) and a health plan sets out eligibility and drug data specifications transmitted between PBM, health plan and pharmacy.  The document used to define these data elements is called a "payer specification sheet".  Data elements related to patient eligibility and to the dispensed prescription are captured in every transaction in which a PBM and/or health plan is involved, including transactions with zero patient cost-share due.  In terms of the Payer Specifications Sheet, these data elements are:  Bin number (to define the responsible health plan), Plan ID, service provider ID (the dispensing pharmacy), Date of service, Cardholder first name, Cardholder last name, Relationship code, Patient ID, Patient first name, Patient last name, Patient address (several fields), Product ID (NDC number), Quantity dispensed, Ingredient cost submitted, Dispensing fee submitted, Patient paid amount submitted, Incentive amount submitted, Sales tax submitted, Gross amount due (including ingredient cost, dispensing fee, incentive, sales tax, as applicable).[6]  Prime Therapeutics' Payer Specification Sheet applicable to BCBS Florida (and other health plans nationwide) is a good example.[7]

---

[3] See NCPDP Data Dictionaries, dated 2015 and 1999.

[4] "The Drug Listing Act of 1972 requires registered drug establishments to provide the Food and Drug Administration (FDA) with a current list of all drugs manufactured, prepared, propagated, compounded, or processed by it for commercial distribution. (See Section 510 of the Federal Food, Drug, and Cosmetic Act (Act) (21 U.S.C. § 360)).  Drug products are identified and reported using a unique, three-segment number, called the National Drug Code (NDC), which serves as a universal product identifier for drugs.  FDA publishes the listed NDC numbers and the information submitted as part of the listing information in the NDC Directory which is updated daily.  The information submitted as part of the listing process, the NDC number, and the NDC Directory are used in the implementation and enforcement of the Act." See FDA, Information on Drugs, *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm142438.htm.  "The NDC Directory contains ONLY information submitted to FDA in SPL electronic listing files by labelers. (A labeler may be either a manufacturer, including a repackager or relabeler, or, for drugs subject to private labeling arrangements, the entity under whose own label or trade name the product will be distributed.)  Inclusion of information in the NDC Directory does not indicate that FDA has verified the information provided.  The content of each NDC Directory entry is the responsibility of the labeler submitting the SPL file."  Id., *available at* http://www.fda.gov/Drugs/InformationOnDrugs/ucm254527.htm.

[5] Following is a general description of FirstDatabank's data set (detail is proprietary to FirstDatabank): http://www.fdbhealth.com/~/media/downloads/form%20required/us/datasheet%20-%20fdb%20medknowledge%20framework.ashx.

[6] Florida law requires generic substitution with limited exceptions.  See Florida Statutes, Regulation of Professions

---

Declaration of Elan Rubinstein, Pharm.D., MPH
*Barba, et al. v. Shire U.S., et al.*, Case No. 13-21158-Civ-Lenard/Goodman (S.D. Fla.)

25.     These data elements – based on NCPDP data standards as discussed above – are used by pharmacies to build and maintain individual patient records.

26.     Beginning in 2009, products described as "dextroamphetamine saccharate, amphetamine aspartate, dextroamphetamine sulfate and amphetamine sulfate capsule, extended release", were sold under an original NDA (New Drug Application) by Shire, labeled as Adderall XR and were sold as Authorized Generics by Barr Pharmaceuticals, division of Teva Pharmaceuticals, and by Global Pharmaceuticals, Division of Impax Laboratories, labeled with the non-proprietary (generic) product name.  Each product has a mandatory FDA-approved package insert that describes the product, and its FDA-approved dose, frequency and use.[8]

27.     NDCs are known for Adderall XR and for its authorized generics.  These NDCs can be used in a drug claims database search.  Drug Facts and Comparisons, a common pharmacy reference, is published by Wolters Kluwer Health.  According to the Drug Facts and Comparisons Drug Identifier and as posted to DailyMed, a database maintained by the National Library of Medicine, the following NDC numbers describe these Adderall XR and authorized generic labeler products[9]:  Impax:  00115132801 (5 mg), 00115132901 (10 mg), 00115133001 (15 mg), 00115133101 (20 mg), 00115133201 (25 mg), 00115133301 (30 mg).  Teva (Barr):  00555079002 (5 mg), 00555078702 (10 mg), 00555079102 (15 mg), 00555078802 (20 mg), 00555079202 (25 mg), 00555078902 (30 mg).  Shire:  54092038101 (5 mg), 54092038301 (10 mg), 54092038501 (15 mg), 54092038701 (20 mg), 54092038901 (25 mg), 54092039101 (30 mg).[10]

28.     It is not uncommon for these data to be used to contact consumers who were prescribed certain prescription drugs.  For instance, from time to time, the FDA requires manufacturers to initiate safety-based drug recalls.   Another example is pharmacist-provided individualized Medication Therapy Management, which is mandated for certain Medicare Part D patients, and often supported by commercial insurers for certain patient groups.

29.     In short, multiple standardized data sets exist and are regularly used in the pharmaceutical supply chain that contain sufficient information as to prescription drugs purchases, sufficiently detailed patient identifiers, when the prescription was dispensed, the pharmacy at which it was dispensed, the total approved prescription cost, and patient's out-of-pocket share of that cost.

---

and Occupations, Pharmacy, ¶ 465.025.

[7] See Prime Therapeutics' Payer Specification Sheet, *available at*
http://www.primetherapeutics.com/Files/CommercialPayorSheet.pdf

[8]  Following is the package insert for Impax's authorized generic:
http://dailymed.nlm.nih.gov/dailymed/archives/fdaDrugInfo.cfm?archiveid=14057.

[9] The last 2 digits of the full 11-digit NDC define bottle size.  If product is available in multiple bottle sizes, the last 2 digits will vary to define them.

[10] See Drug Facts and Comparison Drug Identifier (pertinent excerpt at Exhibit C hereto), *and*
http://dailymed.nlm.nih.gov/dailymed/search.cfm?query=DEXTROAMPHETAMINE+SACCHARATE%2C+AMPHETAMINE+ASPARTATE%2C+DEXTROAMPHETAMINE&searchdb=all&labeltype=all&sortby=rel&page=1&pagesize=100.

Declaration of Elan Rubinstein, Pharm.D., MPH
*Barba, et al. v. Shire U.S., et al.*, Case No. 13-21158-Civ-Lenard/Goodman (S.D. Fla.)

# VIII.  These Data Exist for the Class Period

30.     The realities of modern integrated prescription drug supply chain management mean that the data discussed in Part VII *supra* exist for the Class Period.

31.     Most if not all retail pharmacies in the United States fill prescription drugs for Medicare beneficiaries.  The majority of Medicare beneficiaries have Part D coverage for prescription drugs.  According to Kaiser Family Foundation, 25.6 million Medicare beneficiaries were enrolled in Medicare Part D (prescription drug benefit) as of July 2008.  This represents 61% of total U.S. Medicare enrollment in 2008.[11]  Approximately 19% of Florida's population is enrolled in the Medicare program.  Because Medicare beneficiaries fill approximately three times as many prescriptions annually as do middle-aged Americans, Medicare is a major payer of prescription drugs in Florida.  For this reason, pharmacies throughout Florida adapt their systems to accommodate applicable Medicare rules.[12]

32.     The contract between the Medicare Part D plan sponsor and CMS must contain the provisions which allow CMS to inspect and audit any books and records of a Part D plan sponsor and its delegated first tier, downstream and related entities.  Part D sponsors agree to maintain for 10 years books, records, documents and other evidence of accounting procedures and practices that (d2) include records of (d2xi) all prescription drug claims for the current contract period and for 10 prior periods.[13]  A 10 year drug claims record retention period is also required in Medicaid, for drug claims for which rebate requests have been made.[14]

33.     Accordingly, pharmacies and pharmacy benefit management companies maintain prescription drug claims records for at least 10 years.

34.     This includes prescription drug records, for those who pay cash and who may be uninsured, and for those with third party coverage.  For instance, Walgreens is one of the largest, if not the largest, drug retailing chain in the United States.  In 2007, 736 or 12% of its 5,997 U.S.-based stores, were located in Florida, the largest number of Walgreens pharmacies in any state in which the company has retail pharmacies.  In 2010, Miami-Ft. Lauderdale-Pompano Beach was the 5th largest retail pharmacy market nationwide.  In that year, Walgreens commanded 42% share of the Miami-Ft. Lauderdale-Pompano Beach market.[15]

---

[11] See Medicare Part D. in its Ninth Year, *available at* http://files.kff.org/attachment/medicare-part-d-in-its-ninth-year-the-2014-marketplace-and-key-trends-2006-2014-report; CMS Medicare Enrollment Data, *available at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Statistics-Trends-and-Reports/MedicareEnrpts/Downloads/08All.pdf.

[12] CMS retention requirements effectively set the floor for retention of pertinent records for prescription drug consumers, including Class members, even if they are not Medicare D beneficiaries. See: http://kff.org/medicare/state-indicator/medicare-beneficiaries-as-of-total-pop/#

[13] See 42 C.F.R. § 423.505.

[14] See CMS Compliance Plan and Related Requirements under the Medicare Prescription Drug, Improvement and Modernization Act, *available at*  http://www.hcca-info.org/Portals/0/PDFs/Resources/library/Compliance%20Effectiveness%20101-Steeley.pdf.

[15] See Chain Drug Review, *available at* http://www.rx-edge.com/research%20pdfs/Chaiin_Drug_Review_To_100_Chain_Drug_Markets.pdf; Walgreens Form 10-K for

# X.         CONCLUSION

38.      Based on my professional skills and knowledge, and review of materials in connection with this matter, I conclude that patient-level prescription drug claims level detail exists and is retained for 10 years or longer by dispensing pharmacies and by pharmacy benefit managers; and this does not include other entities in the prescription drug supply chain such as insurers or healthcare providers.  Furthermore, this detail is available to Class members upon request to their pharmacies.

I hereby affirm or aver pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

_____
Elan Rubinstein

Dated:  June 17, 2015

# EXHIBIT E

Selected excerpts from the July 28, 2015 Deposition of Elan Rubinstein, Pharm.D. in this action.

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA (MIAMI)

MONICA BARBA and JONATHAN          )
REISMAN, on behalf of              )
themselves and all                 )
others similarly situated,         )
                                   )
                                   ) Case No.
                                   ) 1:13-cv-21158-JAL
            Plaintiffs,            )
                                   )
v.                                 )
                                   )
SHIRE U.S., INC., a New Jersey     )
Corporation, SHIRE, LLC, a         )
Kentucky Limited Liability         )
Company, and DOES 1 through        )
100, inclusive,                    )
                                   )
            Defendants.            )
_____    )


VIDEOTAPED DEPOSITION OF ELAN RUBINSTEIN

Santa Monica, California

Tuesday, July 28, 2015

9:03 a.m.


REPORTED BY:
GRACE CHUNG, CSR No. 6426, RMR, CRR, CLR
JOB NO:  40006

66

1  right?
2  A. No.
3  Q. Okay. And so the answer to my question is:
4  You don't do any analysis of any data in --
5  A. In the expert report?
6  Q. Yes.
7  A. No, I did not.
8  Q. Can you tell me what a brand loyalist is?
9  A. I'm not aware of that as a formal term. So
10 rather than guess, I'm not going to hazard a guess on
11 that one.
12 Q. You've never heard the term of a "brand
13 loyalist" in a pharmacy arena?
14 A. Not expressed that way, no.
15 Q. Okay. How have you heard it expressed?
16 A. That pharmacies have what are called
17 "loyalty cards," so that someone would use their
18 pharmacy on a repeated basis. Just in that sense.
19 Q. Have you ever heard of a situation where a
20 patient, despite the entry of a generic, stays with
21 the brand product because they are -- they like the
22 brand product better, for one reason or another?
23 A. I've heard that.
24 Q. And have you ever heard that called the
25 brand loyalist?

67

1  A. No.
2  Q. Have you heard it called something else?
3  A. I've not heard that called by a particular
4  name. I'm aware that that does happen.
5  Q. Okay. Is there a field in the NCPDP data
6  dictionaries that would be able to track brand
7  loyalists, as I've just used that term?
8  A. No.
9  MR. ZWALLY: Can we take a five-minute
10 break?
11 THE VIDEOGRAPHER: We are off the record at
12 10:44 a.m.
13 (Recess taken from 10:44 a.m. to
14 10:56 a.m.)
15 THE VIDEOGRAPHER: We are back on the
16 record at 10:56 a.m.
17 MR. ZWALLY: Mr. Rubinstein, I have no
18 further questions for you at this time.
19 THE WITNESS: Okay.
20 MR. HONIK: Dr. Rubinstein, I have some
21 questions of you.
22
23           EXAMINATION
24 BY MR. HONIK:
25 Q. First of all, Mr. Zwally, on behalf of

68

1  Shire, went through your CV, but I think, to an
2  extent, glossed over some of your background and
3  experience.
4  You have a Ph.D., don't you?
5  A. No.
6  Q. What is the highest degree that you earned
7  in your field of expertise?
8  A. A Doctor of Pharmacy.
9  Q. Okay. And are you, as a Doctor of
10 Pharmacy, or have you as a Doctor of Pharmacy,
11 achieved the highest academic recognition for work in
12 that field?
13 A. I have.
14 Q. And are you, from time to time, referred to
15 as Dr. Rubinstein?
16 A. That's the formal designation, yes.
17 Q. And would you mind if I call you
18 Dr. Rubinstein?
19 A. Go ahead.
20 Q. Thank you, sir.
21 Dr. Rubinstein, at my request, did you
22 determine whether or not data exists in the United
23 States of a nature, from pharmacies and health
24 insurers, to allow us to identify persons within a
25 certain date range who purchased Adderall XR?

69

1  A. I did. You did, and I did.
2  Q. All right. And, in fact, in your report,
3  which has been marked, I believe, Exhibit 1, actually
4  have a heading that confirms the existence of such
5  data?
6  A. Yes. You are referring to 13.
7  Q. Thank you. And at my request, did you
8  discuss, in your declaration, where that data exists
9  and how one can access that data?
10 A. I discussed that the patient can obtain
11 that data directly from the pharmacy or the pharmacy
12 chain. It can also be obtained from the PBM or the
13 health plan.
14 Q. And did you, at my request, discuss the
15 fields or nature of the data that's collected by
16 persons in this country who fill prescriptions for
17 Adderall XR?
18 MR. ZWALLY: Objection.
19 BY MR. HONIK:
20 Q. You may answer.
21 A. Yes, I did.
22 Q. And, in fact, you were asked any number of
23 questions by Shire's attorney about the NCPDP;
24 correct?
25 A. That's right.

18 (Pages 66 to 69)

# EXHIBIT F

Selected excerpts from the July 28, 2015 Deposition of Elan Rubinstein, Pharm.D. in this action..

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA (MIAMI)

MONICA BARBA and JONATHAN  )
REISMAN, on behalf of      )
themselves and all         )
others similarly situated, )
                           ) Case No.
                           ) 1:13-cv-21158-JAL
            Plaintiffs,    )
                           )
v.                         )
                           )
SHIRE U.S., INC., a New Jersey )
Corporation, SHIRE, LLC, a )
Kentucky Limited Liability )
Company, and DOES 1 through )
100, inclusive,            )
                           )
            Defendants.    )
_____)


VIDEOTAPED DEPOSITION OF ELAN RUBINSTEIN

Santa Monica, California

Tuesday, July 28, 2015

9:03 a.m.


REPORTED BY:
GRACE CHUNG, CSR No. 6426, RMR, CRR, CLR
JOB NO:  40006

71

A.   The prescription drug data is maintained at
the pharmacy level and at the PBM level and is also
maintained by the health plan.  That data can be
sorted by patient name and by NDC number, which says
exactly what drug, what manufacturer, what strength,
what generic product was dispensed.  It also shows in
that record exactly what the patient cost share was.

It does not say if it was a co-pay
necessarily.  It will say exactly what that co-pay
was -- I'm sorry, the cost share was.  And one can
determine, is it a flat co-pay, is it not a flat
co-pay, for a given line item product by simply
looking at the data.

If you -- if a patient has multiple
prescriptions for multiple drugs -- they don't have to
be Adderall XR, Adderall Immediate Release, or any
other particular drug -- and every single one of those
shows a co-pay of $15, regardless of whether it's a
branded drug or a generic drug, then I would call that
a flat co-pay.

Q.   And, sir, in paragraph 29 of your
declaration, did you, in fact, point out that there
are multiple standardized data sets exist that are
regularly used in the pharmaceutical supply chain that
contain the information about which you just spoke?

86

```
 1    STATE OF CALIFORNIA  )
                          )   ss.
 2    COUNTY OF LOS ANGELES)

 3              I, GRACE CHUNG, RMR, CRR, CSR No. 6246, a

 4    Certified Shorthand Reporter in and for the County of

 5    Los Angeles, the State of California, do hereby

 6    certify:

 7              That, prior to being examined, the witness

 8    named in the foregoing deposition was by me duly sworn

 9    to testify the truth, the whole truth, and nothing but

10    the truth;

11              That said deposition was taken down by me

12    in shorthand at the time and place therein named, and

13    thereafter reduced to typewriting by computer-aided

14    transcription under my direction.

15              Before completion of the deposition, review

16    of the transcript was requested; any changes made by

17    the deponent (and provided to the reporter) during the

18    period allowed are appended hereto.

19              I further certify that I am not interested

20    in the event of the action.

21              In witness whereof, I have hereunto

22    subscribed my name.

23              Dated: July 30th 2015

24

25                          GRACE CHUNG, CSR NO. 6246
```

# EXHIBIT G

Selected excerpts from the July 28, 2015 Deposition of Elan Rubinstein, Pharm.D. in this action.

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA (MIAMI)

MONICA BARBA and JONATHAN )
REISMAN, on behalf of )
themselves and all )
others similarly situated, )
                                   ) Case No.
                                     ) 1:13-cv-21158-JAL
            Plaintiffs, )
                                     )
v. )
                                     )
SHIRE U.S., INC., a New Jersey )
Corporation, SHIRE, LLC, a )
Kentucky Limited Liability )
Company, and DOES 1 through )
100, inclusive, )
                                     )
            Defendants. )
_____ )

VIDEOTAPED DEPOSITION OF ELAN RUBINSTEIN

Santa Monica, California

Tuesday, July 28, 2015

9:03 a.m.

REPORTED BY:
GRACE CHUNG, CSR No. 6426, RMR, CRR, CLR
JOB NO: 40006

74

```
 1       Q.   Doctor, you wrote in paragraph 30, and I
 2   quote, "The realities of modern integrated
 3   prescription drug supply chain management mean that
 4   the data discussed in part 8 of your report supra
 5   exist for the class period."  What do you mean by
 6   that?
 7           MR. ZWALLY:  Objection.
 8   BY MR. HONIK:
 9       Q.   You can answer.
10       A.   This means that the drug data that we have
11   been discussing for this entire deposition exists in
12   amazing detail for all prescriptions dispensed by U.S.
13   pharmacies.  That data is maintained at the pharmacy
14   level for ten years.  It's maintained at the PBM, the
15   pharmacy benefit management company, that was
16   responsible, also for ten years, because that's the
17   requirement from Medicare and from others.
18           It's -- it's -- the same data is also
19   housed at the health plan that has a contract with
20   that PBM.  And subject to HIPAA confidentiality
21   requirements from the federal government, it's
22   available to the employers of those patients.
23       Q.   So given your last response,
24   Dr. Rubinstein, if a theoretical patient forgot where
25   they got their prescription, are there multiple
```

75

```
 1   sources from which they can identify where they got
 2   their Adderall prescription?
 3           MR. ZWALLY:  Objection.
 4       A.   They may not only identify where they got
 5   their prescription through their PBM or their health
 6   plan -- well, I'll just leave it at that.  Yes, they
 7   may.
 8   BY MR. HORNIK:
 9       Q.   Okay.  And you mentioned this ten-year
10   prescription data retention standard.  Where does that
11   come from?
12       A.   That is a Medicare requirement.  It is a
13   requirement from other payers as well, but Medicare
14   is, essentially, the largest payer in the United
15   States -- and its requirements across many areas, not
16   only pharmacy -- dictate what providers do and how
17   they do it, what data they may or may not use and what
18   data they may or may not transmit.
19           HIPAA is another requirement that
20   essentially set the NCPDP as the standard for
21   pharmacy-related claims.
22       Q.   So did you express, in your declaration,
23   Dr. Rubinstein, with reasonable certainty as a
24   pharmacist, that data exist for at least a ten-year
25   period of the type you gave testimony today about?
```

76

```
 1       A.   I did.
 2           MR. ZWALLY:  Objection.
 3       A.   I did express that, and I also showed
 4   demonstration of that fact.
 5   BY MR. HONIK:
 6       Q.   What do you mean by that, sir?
 7           MR. ZWALLY:  Objection.
 8   BY MR. HONIK:
 9       Q.   You may answer.
10       A.   There is one resource from Express Scripts,
11   I believe.  Hold on.  Let me look into my exhibits.
12           Number 17, under "Materials Considered."
13       Q.   Yes, sir.
14       A.   Express Scripts' authorization form.  And
15   it also shows the Web address, the URL of that form.
16   The form actually says that "a patient may request
17   their data directly from the PBM" -- in this case,
18   Express Scripts, which has -- has about 35
19   percent market share of all PBMs throughout the United
20   States.  They cover about 75 million people,
21   thereabouts.
22           In any case, the authorization form is to
23   be filled out by a patient.  If the patient should
24   want their prescription drug data, there is no cost
25   for the patient to receive this data.  And the data,
```

77

```
 1   according to this Express Scripts' authorization form,
 2   is available back to 2006.
 3       Q.   And in your professional experience,
 4   Dr. Rubinstein, is that a standard availability across
 5   the entire waterfront of prescription use?
 6           MR. ZWALLY:  Objection.
 7       A.   You said "this.'"  Ten years is the
 8   standard.
 9   BY MR. HONIK:
10       Q.   Okay.  You used the term, a couple of times
11   to my hearing, that there is an amazing amount of data
12   that would reveal the kinds of information about what
13   you testified.
14           Why do you say there is an amazing amount
15   of data?
16           MR. ZWALLY:  Objection.
17       A.   It's an amazing amount of data, because
18   every single piece of information that you could want
19   to understand how a person uses a prescription drug is
20   housed within the database.  And it doesn't work like
21   that in the medical claims world.  There's far less
22   detail, far, far less detail, available, including for
23   the fact that a patient has an electronic -- a medical
24   record which is usually in the physician's office, not
25   in a medical claims database that the insurance
```

20  (Pages 74 to 77)

78

```
 1    company has access to.  With prescription drugs,
 2    you've got an amazing amount of data to analyze.
 3         I think maybe I stop there.
 4    BY MR. HORNIK:
 5         Q.  Dr. Rubinstein, the data about which you
 6    speak, is it available, for the ten-year period that
 7    I've told us about, in an electronic form?
 8         MR. ZWALLY:  Objection.
 9         A.  Yes, it is available in an electronic form.
10    BY MR. HONIK:
11         Q.  And what's the significance of its
12    availability in an electronic form to one's ability to
13    extract information from it?
14         MR. ZWALLY:  Objection.
15         A.  The availability of the data in electronic
16    forms means that it can be analyzed very, very easily
17    and very efficiently, very cleanly.  An algorithm can
18    be written to identify the patients who receive
19    Adderall XR branded or any other product or any other
20    combination of products.  It can be done very
21    efficiently, very quickly, frankly, not very
22    expensively, and extremely accurately.
23    BY MR. HORNIK:
24         Q.  And among the data that one could extract
25    or manipulate in the way -- or analyze in the way
```

79

```
 1    you've described to us, would one be able to identify
 2    those persons who had and paid a flat co-pay for
 3    Adderall XR?
 4         MR. ZWALLY:  Objection.
 5         A.  Yes, one could.
 6    BY MR. HONIK:
 7         Q.  And so if one wanted to exclude flat
 8    co-payers among the proposed class here, could one do
 9    that with this electronic data?
10         MR. ZWALLY:  Objection.
11         A.  One could definitely do that.  The worst
12    problem you would have in doing that is that there are
13    so, so few flat co-payers, according to the Kaiser
14    Foundation survey that is done every year and has been
15    done for decades now.
16         My review of the 2008 Kaiser Foundation
17    survey of about 2,000 employers and their covered
18    lives show that only 4 percent of those covered lives
19    are in pharmacy benefit plans that have, as you put
20    it, a flat co-pay.  And of that 4 percent, only a
21    third have a co-pay that is flat.  And two-thirds have
22    a coinsurance which, yes, it's 25 percent for all
23    products, whether brand or generic, but on a dollar
24    basis, you multiply an expensive drug times 25 percent
25    and an inexpensive drug times 25 percent, you are
```

80

```
 1    going to come out with different dollars paid.
 2         So only a third of that 4 percent are
 3    actually flat -- are actually co-pays that are set,
 4    not variable, which means that flat co-payers in 2008
 5    would be expected to be about 1 percent of the entire
 6    population, according to the Kaiser survey.
 7         But I would argue that it's actually even
 8    lower, because those same people would typically have
 9    deductibles and would have to meet those deductibles
10    first, so that even though there is a flat co-pay for
11    that 1 percent, they will have paid something within
12    the deductible.
13    BY MR. HORNIK:
14         Q.  Dr. Rubinstein, so if you -- if you were
15    presented with the NCPDP data about which you've given
16    testimony and written in your report, would you be
17    able to identify and confirm class members who
18    purchased Adderall XR during the class period about
19    which you've testified?
20         MR. ZWALLY:  Objection.
21         A.  Not the NCPDP data.  The NCPDP sets
22    standards.  The pharmacy benefit management companies
23    implement those standards of data that they believe
24    are useful within their situations.  So rephrasing
25    your question as -- with reference to PBM data, yes.
```

81

```
 1    BY MR. HORNIK:
 2         Q.  And the PBM data, health insurance data,
 3    and one's prescription records, from among those data
 4    sets, could you, therefore, identify and confirm class
 5    membership of purchasers of Adderall XR for the period
 6    we've been speaking of?
 7         MR. ZWALLY:  Objection.
 8         A.  Yes, absolutely.
 9    BY MR. HORNIK:
10         Q.  And --
11         A.  It's not hard to do.
12         Q.  And I apologize.  I did misspeak.  The NCPDP
13    data that you spoke of, is that the uniform data
14    fields that these various entities -- PBMs, health
15    insurers, pharmacies -- employ to record that data?
16         A.  Yes, with the exception that no --
17         MR. ZWALLY:  Objection, by the way.  I'm
18    sorry.
19         A.  -- no PBM or pharmacy is going to use every
20    single one of those data fields, because they don't
21    need those data fields.
22         However, they will all use what I have
23    referred to in this testimony as the core data fields,
24    which described the patient very clearly, the
25    cardholder, which means the one that is eligible for
```

21  (Pages 78 to 81)

86

1    STATE OF CALIFORNIA  )
          ) ss.
2    COUNTY OF LOS ANGELES)
3         I, GRACE CHUNG, RMR, CRR, CSR No. 6246, a
4    Certified Shorthand Reporter in and for the County of
5    Los Angeles, the State of California, do hereby
6    certify:
7         That, prior to being examined, the witness
8    named in the foregoing deposition was by me duly sworn
9    to testify the truth, the whole truth, and nothing but
10   the truth;
11        That said deposition was taken down by me
12   in shorthand at the time and place therein named, and
13   thereafter reduced to typewriting by computer-aided
14   transcription under my direction.
15        Before completion of the deposition, review
16   of the transcript was requested; any changes made by
17   the deponent (and provided to the reporter) during the
18   period allowed are appended hereto.
19        I further certify that I am not interested
20   in the event of the action.
21        In witness whereof, I have hereunto
22   subscribed my name.
23        Dated: July 30th 2015
24
25             GRACE CHUNG, CSR NO. 6246

88

1               E R R A T A
2
3
4
5         I wish to make the following changes,
6    for the following reasons:
7
8    PAGE LINE
9    ___ ___ CHANGE:_____
10   REASON:_____
11   ___ ___ CHANGE:_____
12   REASON:_____
13   ___ ___ CHANGE:_____
14   REASON:_____
15   ___ ___ CHANGE: _____
16   REASON:_____
17   ___ ___ CHANGE: _____
18   REASON:_____
19   ___ ___ CHANGE: _____
20   REASON:_____
21
22   _____  _____
23   WITNESS' SIGNATURE       DATE
24
25

87

1          INSTRUCTIONS TO WITNESS
2
3        Please read your deposition over carefully
4    and make any necessary corrections. You should state
5    the reason in the appropriate space on the errata
6    sheet for any corrections that are made.
7        After doing so, please sign the errata sheet
8    and date it.
9        You are signing same subject to the changes
10   you have noted on the errata sheet, which will be
11   attached to your deposition.
12        It is imperative that you return the original
13   errata sheet to the deposing attorney within thirty
14   (30) days of receipt of the deposition transcript by
15   you. If you fail to do so, the deposition transcript
16   may be deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

23 (Pages 86 to 88)

# EXHIBIT H

Selected excerpts from the July 28, 2015 Deposition of Elan Rubinstein, Pharm.D. in this action.



# Payer Specification Sheet

for Prime Therapeutics Commercial Clients (excludes Medicare Part D)

**Revised December 2011**

## Inside

BIN . . . . . . . . . . . . . . . . . . . . . . . . . See BINs on page 2 (in **bold blue** type)
PCN. . . . . . . . . . . . . . . . . . . . . . . . . See PCNs on page 2 (in **bold blue** type)
States. . . . . . . . . . . . . . . . . . . . . . . . National
Destination . . . . . . . . . . . . . . . . . . PRIME/RxClaim
Accepting. . . . . . . . . . . . . . . . . . . . Claim Adjudication, Reversals
Format . . . . . . . . . . . . . . . . . . . . . . . NCPDP Version 5.1
Prime Contact Center. . . . . . . . . . . 800.821.4795

## Segment and field requirements by transaction type

Billing **(B1)** and Reversal (B2) Transaction Data Elements:

- **M** = Mandatory by HIPAA
- **R** = Required by Prime
- **S** = Situational
- **\*\*\*V** = Repeat Field

A "**Situational**" data element means the NCPDP Standard does **not** require data on all claims, but the PLAN SPONSOR reserves the possibility of use in specific claim situations. The **"Mandatory"** and **"Required"** fields within a "**Situational**" segment are only mandatory IF the segment is being utilized.

Situational segments can be transmitted, however, not all segments are supported. Please call the Prime Contact Center at 800.821.4795 for more information regarding the support of claim segments.

→ B3 transactions **not** supported

→ CONTROLLED SUBSTANCE REPORTING **(C1, C2, C3)** TRANSACTION DATA ELEMENTS
   Prime does **not** support controlled substance reporting transactions

→ ENHANCED ELIGIBILITY VERIFICATION **(E1)** TRANSACTION DATA ELEMENTS
   Prime does **not** support eligibility verification transactions

→ INFORMATION **(N1, N2, N3)** TRANSACTION DATA ELEMENTS
   Prime does **not** support informational transactions

→ PRIOR AUTHORIZATION **(P1, P2, P3)** TRANSACTION DATA ELEMENTS
   Prime does **not** support prior authorization transactions



| Transaction Header Segment — Mandatory | | | Segment is required. |
|---|---|---|---|
| **NCPDP Field** | **Field Name** | **Mandatory, Required, or Situational** | **Comments/Values** |
| 101-A1 | BIN NUMBER | M | **004915:** BCBS of AL<br>**011552:** BCBS of IL, NM, OK, TX, and Medicare Advantage PPO<br>**012833:** BCBS of FL<br>**610455:** BCBS of KS, MN, MT, NE, ND, CHS, Noridian, PrimeWest, SCHA Medicaid, SCHA MSCPlus, UPlan, Hormel, NPA Part B<br>**800001:** BCBS of WY |
| 102-A2 | VERSION/RELEASE NUMBER | M | Use 51 |
| 103-A3 | TRANSACTION CODE | M | All plans allow B1, B2 |
| 104-A4 | PROCESSOR CONTROL NUMBER | M | **BCTX:** BCBS of TX<br>**CARVE:** Non-BCBS Clients<br>**FLBC:** BCBS of FL<br>**HMBC:** BCBS of MT<br>**HMONE, HRTLD, RXNEB or PPNI1:** BCBS of NE<br>**HORMEL:** Hormel Foods<br>**ILDR or ILSC:** BCBS of IL<br>**KSBCS:** BCBS of KS<br>**NDBCS:** BCBS of ND<br>**NMDR:** BCBS of NM<br>**NMMCARE:** Medicare Advantage PPO (BCBS of NM)<br>**NORID:** Noridian<br>**PARTB:** BCBS of AL Medicare Part B Benefits, NPA Part B<br>**PGIGN:** BCBS of MN<br>**PGNB1 or PGIGN:** CHS<br>**PWEST:** PrimeWest<br>**SALUD:** BCNS of NM BlueSalud<br>**SHMCD:** SCHA Medicaid<br>**SHMSC:** SCHA MSCPlus<br>**TXMCARE:** Medicare Advantage PPO (BCBS of TX)<br>**UMEMP:** UPlan<br>**WRI:** BCBS of AL Work Related Injury Benefit<br>**WYBCS:** BCBS of WY<br>**1215:** BCBS of OK Drug Card<br>**1217:** BCBS of OK Comp Card |
| 109-A9 | TRANSACTION COUNT | M | 01 – 04 (up to 4 transactions per B1 transmission) accepted; only 01 for a B2 transaction |
| 202-B2 | SERVICE PROVIDER ID QUALIFIER | M | 01 – NPI |
| 201-B1 | SERVICE PROVIDER ID | M | |
| 401-D1 | DATE OF SERVICE | M | CCYYMMDD |
| 110-AK | SOFTWARE VENDOR/CERTIFICATION ID | M | Use value for Switch's requirements. If submitting claim without a Switch, populate with blanks |

*Continued*

Patient Segment — Situational

Client requires segment for B1 and B2 transactions to locate correct member number.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|---|---|---|---|
| 111-AM | SEGMENT IDENTIFICATION | M | 01 – transmit *only* if the segment is transmitted |
| 331-CX | PATIENT ID QUALIFIER | S | Required for Worker's Comp |
| 332-CY | PATIENT ID | R | Required for Worker's Comp |
| 304-C4 | DATE OF BIRTH | R | |
| 305-C5 | PATIENT GENDER CODE | S | Required for BCBS of AL, BIN 004915<br>BCBS of Minnesota Blue Advantage BIN 610455, PCN PGIGN<br>BCBS of Minnesota MN Care BIN 610455, PCN PGIGN<br>PrimeWest BIN 610455, PCN PWEST<br>South Country Health Alliance Medicaid BIN 610455, PCN SHMCD<br>South Country Health Alliance MSCPlus BIN 610455, PCN SHMSC |
| 310-CA | PATIENT FIRST NAME | R | *Note:* For BCBS of MN, this is required only for group MP10705. This is required for all other BCBS plans, when DOB and gender are identical |
| 311-CB | PATIENT LAST NAME | S | Required for Worker's Comp. Required for BCBS of IL BlueScript<br>BIN = **011552**, PCN = **ILSC** |
| 322-CM | PATIENT STREET ADDRESS | S | Required for Worker's Comp |
| 323-CN | PATIENT CITY ADDRESS | S | Required for Worker's Comp |
| 324-CO | PATIENT STATE / PROVINCE ADDRESS | S | Required for Worker's Comp |
| 325-CP | PATIENT ZIP/POSTAL ZONE | S | Required for Worker's Comp |
| 326-CQ | PATIENT PHONE NUMBER | S | Required for Worker's Comp |
| 307-C7 | PATIENT LOCATION | S | |
| 333-CZ | EMPLOYER ID | S | |
| 334-1C | SMOKER / NON-SMOKER CODE | S | |
| 335-2C | PREGNANCY INDICATOR | S | |

Insurance Segment — Situational

Segment is required for B1 transactions. Not required for B2 transactions.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|---|---|---|---|
| 111-AM | SEGMENT IDENTIFICATION | M | 04 – transmit *only* if the segment is transmitted |
| 302-C2 | CARDHOLDER ID | M | |
| 312-CC | CARDHOLDER FIRST NAME | S | |
| 313-CD | CARDHOLDER LAST NAME | S | |
| 314-CE | HOME PLAN | S | |
| 524-FO | PLAN ID | S | |
| 309-C9 | ELIGIBILITY CLARIFICATION CODE | S | As needed to override a Reject (3 for full-time student) |
| 336-8C | FACILITY ID | S | |
| 301-C1 | GROUP ID | S | |
| 303-C3 | PERSON CODE | S | |
| 306-C6 | PATIENT RELATIONSHIP CODE | S | Required for BCBSOK Comp Card only<br>BIN 011552, PCN 1217 |

Continued

Claim Segment — Mandatory                                    Segment is required for B1 tand B2 transactions.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|---|---|---|---|
| 111-AM | SEGMENT IDENTIFICATION | M | 07 – transmit **only** if the segment is transmitted |
| 455-EM | PRESCRIPTION/SERVICE REFERENCE NUMBER QUALIFIER | M | Only value '1' is accepted |
| 402-D2 | PRESCRIPTION/SERVICE REFERENCE NUMBER | M | Only supports 7-digit Rx # |
| 436-E1 | PRODUCT/SERVICE ID QUALIFIER | M | 03 |
| 407-D7 | PRODUCT/SERVICE ID | M | NDC number |
| 456-EN | ASSOCIATED PRESCRIPTION/SERVICE REFERENCE # | S | |
| 457-EP | ASSOCIATED PRESCRIPTION/SERVICE DATE | S | |
| 458-SE | PROCEDURE MODIFIER CODE COUNT | S | Required **only** if Procedure Modifier Code submitted |
| 459-ER | PROCEDURE MODIFIER CODE | S | |
| 442-E7 | QUANTITY DISPENSED | R | |
| 403-D3 | FILL NUMBER | R | |
| 405-D5 | DAYS SUPPLY | R | |
| 406-D6 | COMPOUND CODE | S | When submitting a compound, submit the value of "2" and the NDC value of the most expensive Federal Legend Drug within the compound Required for: BCBS of Minnesota Blue Advantage BIN 610455, PCN PGIGN BCBS of Minnesota MN Care BIN 610455, PCN PGIGN PrimeWest BIN 610455, PCN PWEST South Country Health Alliance Medicaid BIN 610455, PCN SHMCD South Country Health Alliance MSCPlus BIN 610455, PCN SHMSC |
| 408-D8 | DISPENSE AS WRITTEN (DAW)/ PRODUCT SELECTION CODE | R | |
| 414-DE | DATE PRESCRIPTION WRITTEN | S | Required for: BCBS of AL, BIN 004915 BCBS of Minnesota Blue Advantage BIN 610455, PCN PGIGN BCBS of Minnesota MN Care BIN 610455, PCN PGIGN PrimeWest BIN 610455, PCN PWEST South Country Health Alliance Medicaid BIN 610455, PCN SHMCD South Country Health Alliance MSCPlus BIN 610455, PCN SHMSC |
| 415-DF | NUMBER OF REFILLS AUTHORIZED | S | |
| 419-DJ | PRESCRIPTION ORIGIN CODE | S | Effective 1/1/11 required for all prescriptions including refills for: BCBS of NM BIN 011552, PCN NMDR Accepted Values: 1-Written          3-Electronic 2-Telephone        4-Facsimile |
| 420-DK | SUBMISSION CLARIFICATION CODE | S | |
| 460-ET | QUANTITY PRESCRIBED | S | Partial fills not supported |
| 308-C8 | OTHER COVERAGE CODE | S | Value 04: Other Coverage Exists Required for: BCBS NM Blue Salud BIN 011552, PCN NMDR |
| 429-DT | UNIT DOSE INDICATOR | S | |

*Continued*

*Claim Segment continued*

| 445-EA | ORIGINALLY PRESCRIBED PRODUCT/ SERVICE CODE | S | Partial fills not supported |
|--------|---------------------------------------------|---|------------------------------|
| 446-EB | ORIGINALLY PRESCRIBED QUANTITY | S | Partial fills not supported |
| 330-CW | ALTERNATE ID | S | |
| 454-EK | SCHEDULED PRESCRIPTION ID NUMBER | S | |
| 600-28 | UNIT OF MEASURE | S | Not supported |
| 418-DI | LEVEL OF SERVICE | S | |
| 461-EU | PRIOR AUTHORIZATION TYPE CODE | S | Submit a value of "1" when a PA number is submitted in field 462-EV |
| 462-EV | PRIOR AUTHORIZATION NUMBER SUBMITTED | S | Situation determined by client |
| 463-EW | INTERMEDIARY AUTHORIZATION TYPE ID | S | |
| 464-EX | INTERMEDIARY AUTHORIZATION ID | S | |
| 343-HD | DISPENSING STATUS | S | Partial fills not supported |
| 344-HF | QUANTITY INTENDED TO BE DISPENSED | S | Partial fills not supported |
| 345-HG | DAYS SUPPLY INTENDED TO BE DISPENSED | S | Partial fills not supported |

## Pharmacy Provider Segment — Situational      Segment is not required.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|-------------|-----------|-------------------------------------|-----------------|
| 111-AM | SEGMENT IDENTIFICATION | M | 02 – transmit *only* if the segment is transmitted |
| 465-EY | PROVIDER ID QUALIFIER | S | |
| 444-E9 | PROVIDER ID (NCPDP #) | S | |

## Prescriber Segment      Segment is required for B1 transactions.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|-------------|-----------|-------------------------------------|-----------------|
| 111-AM | SEGMENT IDENTIFICATION | M | 03 – transmit *only* if the segment is transmitted |
| 466-EZ | PRESCRIBER ID QUALIFIER | R | Accepted values<br>01 – NPI (preferred value)<br>12 – DEA<br>Prescriber NPI required for: BCBS of NM, BIN 011552, PCN NMDR<br>SCHA Medicaid, BIN 610455, PCN SHMCD<br>SCHA MSCPlus, BIN 610455, PCN SHMSC |
| 411-DB | PRESCRIBER ID | R | Applicable value for the qualifier used in 466-EZ above |
| 467-1E | PRESCRIBER LOCATION CODE | S | |
| 427-DR | PRESCRIBER LAST NAME | S | |
| 498-PM | PRESCRIBER PHONE NUMBER | S | |
| 468-2E | PRIMARY CARE PROVIDER ID QUALIFIER | S | |
| 421-DL | PRIMARY CARE PROVIDER ID | S | |
| 469-H5 | PRIMARY CARE PROVIDER LOCATION CODE | S | |
| 470-4E | PRIMARY CARE PROVIDER LAST NAME | S | |

*Continued*

COB/Other Payments Segment — Situational                                    Not supported.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|---|---|---|---|
| 111-AM | SEGMENT IDENTIFICATION | M | 05 – transmit *only* if the segment is transmitted |
| 337-4C | COORDINATION OF BENEFITS/OTHER PAYMENTS COUNT | M | |
| 338-5C | OTHER PAYER COVERAGE TYPE | M***V*** | |
| 339-6C | OTHER PAYER ID QUALIFIER | S***V*** | |
| 340-7C | OTHER PAYER ID | S***V*** | |
| 443-E8 | OTHER PAYER DATE | S***V*** | |
| 341-HB | OTHER PAYER AMOUNT PAID COUNT | S | |
| 342-HC | OTHER PAYER AMOUNT PAID QUALIFIER | S***V*** | |
| 431-DV | OTHER PAYER AMOUNT PAID | S***V*** | |
| 471-5E | OTHER PAYER REJECT COUNT | S | |
| 472-6E | OTHER PAYER REJECT CODE | S***V*** | |

Worker's Compensation Segment — Situational                                 Segment is not required.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|---|---|---|---|
| 111-AM | SEGMENT IDENTIFICATION | M | 06 – transmit *only* if the segment is transmitted |
| 434-DY | DATE OF INJURY | M | |
| 315-CF | EMPLOYER NAME | S | |
| 316-CG | EMPLOYER STREET ADDRESS | S | |
| 317-CH | EMPLOYER CITY ADDRESS | S | |
| 318-CI | EMPLOYER STATE/PROVINCE ADDRESS | S | |
| 319-CJ | EMPLOYER ZIP/POSTAL ZONE | S | |
| 320-CK | EMPLOYER PHONE NUMBER | S | |
| 321-CL | EMPLOYER CONTACT NAME | S | |
| 327-CR | CARRIER ID | S | |
| 435-DZ | CLAIM/REFERENCE ID | S | |

DUR/PPS Segment — Required — Situational                     Segment is not required. Use encouraged if applicable. Not
                                                             required for B2 transaction.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|---|---|---|---|
| 111-AM | SEGMENT IDENTIFICATION | M | 08 – transmit *only* if the segment is transmitted |
| 473-7E | DUR/PPS CODE COUNTER | S***V*** | Required if segment used. 1 to 9 occurrances are supported |
| 439-E4 | REASON FOR SERVICE CODE | S***V*** | Required if segment used |
| 440-E5 | PROFESSIONAL SERVICE CODE | S***V*** | Vaccine Admin, MA – Medication Administration |
| 441-E6 | RESULT OF SERVICE CODE | S***V*** | Required if segment used |
| 474-8E | DUR/PPS LEVEL OF EFFORT | S***V*** | Required if segment used |
| 475-J9 | DUR CO-AGENT ID QUALIFIER | S***V*** | Required if 476-H6 used. Values 01, 02, 03, 20 |
| 476-H6 | DUR CO-AGENT ID | S***V*** | Encouraged if code DC, DD, ID, MC, TD, in 439-E4 |

*Continued*

Pricing Segment — Mandatory

Segment is required for B1 transactions.
Not required for B2 transactions

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|---|---|---|---|
| 111-AM | SEGMENT IDENTIFICATION | M | 11 – transmit *only* if the segment is transmitted |
| 409-D9 | INGREDIENT COST SUBMITTED | R | Medicaid Programs: 340B claims require the actual acquisition cost as purchased under the 340B program. Required for: BCBS of Minnesota Blue Advantage BIN 610455, PCN PGIGN BCBS of Minnesota MN Care BIN 610455, PCN PGIGN PrimeWest BIN 610455, PCN PWEST South Country Health Alliance Medicaid BIN 610455, PCN SHMCD South Country Health Alliance MSCPlus BIN 610455, PCN SHMSC BCBS of NM BlueSalud BIN 011552, PCN NMDR |
| 412-DC | DISPENSING FEE SUBMITTED | S | |
| 477-BE | PROFESSIONAL SERVICE FEE SUBMITTED | S | |
| 433-DX | PATIENT PAID AMOUNT SUBMITTED | S | Required when needed by plan for proper adjudication |
| 438-E3 | INCENTIVE AMOUNT SUBMITTED | S | |
| 478-H7 | OTHER AMOUNT CLAIMED SUBMITTED COUNT | S | |
| 479-H8 | OTHER AMOUNT CLAIMED SUBMITTED QUALIFIER | S***V*** | |
| 480-H9 | OTHER AMOUNT CLAIMED SUBMITTED | S***V*** | |
| 481-HA | FLAT SALES TAX AMOUNT SUBMITTED | S | |
| 482-GE | PERCENTAGE SALES TAX AMOUNT SUBMITTED | S | |
| 483-HE | PERCENTAGE SALES TAX RATE SUBMITTED | S | |
| 484-JE | PERCENTAGE SALES TAX BASIS SUBMITTED | S | |
| 426-DQ | USUAL AND CUSTOMARY CHARGE | R | |
| 430-DU | GROSS AMOUNT DUE | S | |
| 423-DN | BASIS OF COST DETERMINATION | S | Medicaid Programs: 340B claims require the value of "9" |

Coupon Segment — Situational

Required for B1 transactions *only* if coupons apply to the claims. Not required for B2 transactions.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|---|---|---|---|
| 111-AM | SEGMENT IDENTIFICATION | M | 09 – transmit *only* if the segment is transmitted |
| 485-KE | COUPON TYPE | M | Required if segment used |
| 486-ME | COUPON NUMBER | M | Required if segment used |
| 487-NE | COUPON VALUE AMOUNT | S | |

*Continued*

Compound Segment — Situational                                                                  Not supported.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|---|---|---|---|
| 111-AM | SEGMENT IDENTIFICATION | M | 10 – transmit *only* if the segment is transmitted |
| 450-EF | COMPOUND DOSAGE FORM DESCRIPTION CODE | M | |
| 451-EG | COMPOUND DISPENSING UNIT FORM INDICATOR | M | |
| 452-EH | COMPOUND ROUTE OF ADMINISTRATION | M | Required for:<br>BCBS of Minnesota Blue Advantage BIN 610455, PCN PGIGN<br>BCBS of Minnesota MN Care BIN 610455, PCN PGIGN<br>PrimeWest BIN 610455, PCN PWEST<br>South Country Health Alliance Medicaid BIN 610455, PCN SHMCD<br>South Country Health Alliance MSCPlus BIN 610455, PCN SHMSC |
| 447-EC | COMPOUND INGREDIENT COMPONENT COUNT | M | |
| 488-RE | COMPOUND PRODUCT ID QUALIFIER | M***V*** | |
| 489-TE | COMPOUND PRODUCT ID | M***V*** | |
| 448-ED | COMPOUND INGREDIENT QUANTITY | M***V*** | |
| 449-EE | COMPOUND INGREDIENT DRUG COST | S***V*** | |
| 490-UE | COMPOUND INGREDIENT BASIS OF COST DETERMINATION | S***V*** | Required for:<br>BCBS of Minnesota Blue Advantage BIN 610455, PCN PGIGN<br>BCBS of Minnesota MN Care BIN 610455, PCN PGIGN<br>PrimeWest BIN 610455, PCN PWEST<br>South Country Health Alliance Medicaid BIN 610455, PCN SHMCD<br>South Country Health Alliance MSCPlus BIN 610455, PCN SHMSC |

Prior Authorization Segment — Situational                     Submit segment for B1 transactions upon pharmacy contact center request. Not required for B2 transactions.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|---|---|---|---|
| 111-AM | SEGMENT IDENTIFICATION | M | 12 – transmit *only* if the segment is transmitted |
| 498-PA | REQUEST TYPE | M | Values 1, 2, 3 accepted |
| 498-PB | REQUEST PERIOD DATE-BEGIN | M | Only stored at this time, format must be correct |
| 498-PC | REQUEST PERIOD DATE-END | M | Only stored at this time, format must be correct |
| 498-PD | BASIS OF REQUEST | M | Values ME, PR, PL accepted |
| 498-PE | AUTHORIZED REPRESENTATIVE FIRST NAME | S | |
| 498-PF | AUTHORIZED REPRESENTATIVE LAST NAME | S | |
| 498-PG | AUTHORIZED REPRESENTATIVE STREET ADDRESS | S | |
| 498-PH | AUTHORIZED REPRESENTATIVE CITY ADDRESS | S | |
| 498-PJ | AUTHORIZED REPRESENTATIVE STATE/ PROVINCE ADDRESS | S | |
| 498-PK | AUTHORIZED REPRESENTATIVE ZIP/ POSTAL ZONE | S | |

*Continued*

*Prior Authorization Segment continued*

| 498-PY | PRIOR AUTHORIZATION NUMBER— ASSIGNED | S | |
|--------|--------------------------------------|---|---|
| 503-F3 | AUTHORIZATION NUMBER | R | |
| 498-PP | PRIOR AUTHORIZATION SUPPORTING DOCUMENTATION | S | |

Clinical Segment — Situational

Segment is not required. Submit segment for B1 transactions only if one or more specific fields are required for a specific claim.

| NCPDP Field | Field Name | Mandatory, Required, or Situational | Comments/Values |
|-------------|------------|-------------------------------------|-----------------|
| 111-AM | SEGMENT IDENTIFICATION | M | 13 – transmit *only* if the segment is transmitted |
| 491-VE | DIAGNOSIS CODE COUNT | S | Required when instructed by POS messaging |
| 492-WE | DIAGNOSIS CODE QUALIFIER | S***V*** | Required when instructed by POS messaging |
| 424-DO | DIAGNOSIS CODE | S***V*** | Required when instructed by POS messaging |
| 493-XE | CLINICAL INFORMATION COUNTER | S***V*** | |
| 494-ZE | MEASUREMENT DATE | S***V*** | |
| 495-H1 | MEASUREMENT TIME | S***V*** | |
| 496-H2 | MEASUREMENT DIMENSION | S***V*** | |
| 497-H3 | MEASUREMENT UNIT | S***V*** | |
| 499-H4 | MEASUREMENT VALUE | S***V*** | |

## General information

→ Direct any 5.1 claim production questions to the Prime Contact Center at 800.821.4795

→ Maximum prescriptions per transaction is four (4)

→ Pharmacy Registration with Payer required

→ Preferred entry for Prescriber ID is DEA # or NPI (beginning May 2007)

→ The data elements listed in the Specification Sheet are presented so as to encompass all Prime subscriber plans; however, specific requirements may vary from plan to plan; call the Prime Contact Center for detailed information regarding specific plan requirements

→ Prime's Switch Support: Relay Health/PerSé Technologies, Emdeon/WebMD, eRx

→ Prime provides online prospective DUR edits for its plans; please call the Prime Contact Center for more information